## COOPER ET AL. *v.* HAM ET AL.

PRACTICE.—*Motion for New Trial.*—A motion for a new trial on the ground of the improper admission or exclusion of evidence, for the character and purport of which reference is made to a bill of exceptions not then filed, is too uncertain and indefinite to present any question.

HUSBAND AND WIFE.—*Proceedings to Subject Real Estate to Payment of Debt.—*

A. bought certain real estate with a mill thereon of B., and caused it to be conveyed to the wife of A. Certain real estate of the wife of A. was given in part payment to B., and the notes of A. and wife secured by mortgage were given for the residue of the purchase-money. Before the notes were paid, the mill was burned, and thereafter the real estate was reconveyed to B., who accepted it as part payment of the notes. A. and wife had no money or property wherewith to pay the balance. C., a brother of A. had assisted him in running the mill before it was burned, and on certain contingencies was to have become the owner of a part of it. The citizens and neighbors raised some money to aid in starting another mill. C. procured another tract of real estate on his own credit, and on the suggestion of those proposing to aid in the erection of the mill, conveyed one-half of it to the wife of A., and the two brothers, with the assistance given them and on their credit, erected a mill, each of them working in the erection and running of the same.

*Held,* that B. could not subject the latter real estate to the payment of the balance due on his notes.

SAME.—*Agency of Husband.*—A wife may employ her husband to act as her agent in operating a mill owned by her, and such employment is not proof of an attempt on her part to defraud his creditors.

SAME.—The husband in such case has the right to give his personal services and skill to the management of his wife's property without any other compensation than the support and maintenance of himself and family.

From the Howard Circuit Court.

*N. R. Overman* and *J. O'Brien,* for appellants.

*J. W. Kern, L. J. Hackney,* and *N. R. Linsday,* for appellees.

BUSKIRK, J.—The appellants by this action sought the recovery of a personal judgment against George W. Ham, upon two notes executed by him and his wife, and payable to the appellants, and a decree subjecting certain real estate to sale for the payment of such judgment.

A demurrer was overruled to the complaint and sustained to the second paragraph of the separate answers of each of the appellees, but no question is made in reference to such rulings.

The cause was tried by the court and resulted in a finding against George W. Ham in the sum of two thousand five hundred and ninety-seven dollars and sixty-six cents, and a finding in favor of the other appellees.

There is in the record what purports to be a special find-ing of facts and conclusions of law thereon, but such special finding is not signed by the judge, and does not appear to have been rendered at the request of either of the parties, and con-sequently no question is presented for our decision in reference to the conclusions of law announced.

The only assignment of error which presents any question here is based upon the action of the court in overruling the motion for a new trial, and that only presents the question whether the finding is sustained by the evidence. The appel-lants assigned as reasons for a new trial the admission of improper and the exclusion of proper evidence, as to the character and purport of which reference is made to the bill of exceptions, which was not then in existence, and was not signed and filed until long after the adjournment of the court. It is settled by repeated decisions of this court, that such rea-sons are too uncertain and indefinite to present any question for the decision of the lower court, and hence cannot be con-sidered here.

The evidence is quite voluminous, but the facts proved can be so summarized as to present the questions of law arising thereon.

1. That on the 2d day of July, 1868, George W. Ham pur-chased of the appellants six acres of land with a mill thereon, for the sum of sixty-five hundred dollars, and caused the same to be conveyed to his wife, Frances A. Ham ; that in payment of twenty-five hundred dollars of such purchase-money, Ham and wife conveyed to appellants sixty acres of land, which Frances A. had inherited from her father, and held as her sep-arate estate; that for the balance of such purchase-money, George W. and Frances A. gave their notes and a mortgage on the property so purchased; that George W., being a prac-tical miller, took charge of such mill and operated the same until the 15th day of June, 1870, when such mill was entirely consumed by fire; that during the time the said mill was so operated, George W. paid the appellants, out of the earnings of such mill, the sum of eleven hundred and fifty dollars ;

that after the mill burned, George W. and Frances A. recon-
veyed to appellants the six acres of land, and received a credit
therefor in the sum of twelve hundred and sixty dollars, which
left unpaid of such purchase-money the two notes sued on for
one thousand dollars each, due respectively the 1st days of
January, 1872 and 1873, with six per cent. interest; that the
said George W. had no money or property of his own when
such property was purchased; that Martin G. Ham, a brother
of George W., and appellee, had no interest in such mill, but
aided and assisted in running and operating the same under
an agreement that when the purchase-money was paid to appel-
lants, he was to have a one-third interest therein, but such
arrangement was never consummated.

2. After the mill was burned, the citizens in and about
Russiaville, where such mill had been situated, held several
public meetings, and means were adopted to induce George
W. and Martin G. Ham to build another mill in said town;
that the sum of about sixteen hundred dollars in money, mate-
rials, and labor, were subscribed, to be expended under the
control and management of a committee, about eighty per
cent. of which was afterward paid; that such citizens were
actuated mainly by a desire to have a mill in their vicinity,
and secondarily to aid the Hams, who had lost everything by
the fire; that while they desired George W. Ham to superin-
tend the erection and operate the mill after its completion,
they were unwilling that the title to such mill and necessary
ground should be in him, because the appellants would sell
the same on execution to satisfy their claims against him; that
it was at first supposed that the fact that Frances A. Ham had
signed the notes to appellants would render her liable, and
that such property could be reached in her hands; that to
avoid these dangers, Martin G. Ham purchased of Dr. Shir-
ley certain ground as a site for such mill, and took a deed in
his own name, and executed his own note for one hundred
and fifty dollars in payment therefor; the money subscribed by
the citizens being insufficient to erect such mill, the enterprise
was about to be abandoned, when it was ascertained that a

mill could be purchased in Miami county and removed to Russiaville; the Hams went and examined the mill, and ascertained that it could be purchased for two thousand three hundred dollars; that to aid in the purchase of said mill, one Thomas Ratcliff conveyed to Martin G. Ham forty acres of land, and took his note therefor and a mortgage on the mill when put up at Russiaville; the mill purchased as aforesaid was paid for as follows: one thousand dollars in the land conveyed by Ratcliff; two hundred dollars cash, of money subscribed by citizens; two notes for two hundred and fifty dollars each, which were signed by the Hams and the committee of citizens; that there was an incumbrance on said mill of six hundred dollars, which was assumed by the purchasers; that the mill-site and mill were conveyed to Martin G. and Frances A. Ham; that after such mill was removed to Russiaville, the said committee, having ascertained that Mrs. Frances A. Ham had not rendered herself personally liable by signing the notes sued on, and having great sympathy for her in her loss by the fire, required of Martin G. Ham, as a condition on which they would aid in the construction of such mill, that he should convey to her one undivided half of said real estate purchased as a site for said mill; and such conveyance was made to her without the knowledge of herself or husband; that George W. and Martin G. Ham superintended and directed the erection of said mill, and aided, by their own labor and the use of a wagon and team which belonged to them, in its construction; that after the mill was completed, George W. and Martin G. ran and operated such mill until the 7th day of March, 1872, when Martin G. sold and conveyed to Melvin Seward one undivided half of such mill for twenty-seven hundred dollars, which was to be paid as follows: six hundred dollars, paid in cash; two notes for three hundred and ninety-eight dollars each, payable in eighteen and thirty months; and Seward assumed the payment of one-half of the debts of the mill, which were estimated at about fourteen hundred dollars; that after the mill commenced running, the Hams erected on the lots purchased of Dr. Shirley a small

frame house, at a cost of about three hundred and fifty dollars, which was paid for out of the earnings of the mill, and was used by George W. Ham and his wife as a residence; the lots purchased of Dr. Shirley were paid for out of the earnings of the mill, and the two notes given for the mill purchased in Miami county were paid out of the earnings of the mill; that after Seward became the owner of one-half of such mill, he paid out of the earnings of the mill six hundred and twenty-eight dollars to Ratcliff, and he and George W. Ham executed a new note for four hundred dollars for the balance due, and secured the same by mortgage on mill, executed by Seward and wife and George W. Ham and wife; that there had been a foreclosure of the note for six hundred dollars, which was on the mill in Miami county when purchased, and the payment of which was assumed, which judgment was against Seward and George W. and Frances A. Ham; that George W. Ham had continuously worked and superintended the said mill from the time of its completion down to the commencement of the action; and that, when Seward purchased the interest of Martin G. Ham, he knew that George W. Ham was indebted to the appellants on the notes in suit for the old mill, which was burned, and he also knew of the donations made by the citizens, and how the mill was purchased and paid for as above stated, and made the purchase in good faith, and, as he swears, without any knowledge that the title had been taken in the name of Martin G. and Frances A., for the purpose of defrauding the appellants.

It is very earnestly insisted by counsel for appellants, that, upon the facts stated, George W. Ham was the owner of the entire mill, and that the court erred in refusing to decree its sale for the payment of the judgment rendered against him and in favor of appellants.

The acquisition of the property in controversy is very peculiar and unusual. After the destruction of the mill purchased of appellants, neither of the Hams possessed any money or property, and had it not been for the action of the citizens the present mill would not have been erected. It very clearly

appears, from the evidence, that Martin G. Ham purchased the site for the present mill from Dr. Shirley in his own name and upon his individual credit, and he afterward, upon the requirement of the committee of the donors, conveyed one undivided half thereof to Mrs. Frances A. Ham. After the old mill was purchased in Miami county, Mr. Ratcliff conveyed to Martin G. Ham forty acres of land, which was used in part payment therefor. Martin G. Ham devoted his entire time, labor, and skill in the erection and operation of the mill, and was the recipient of the donation on the part of the citizens. We are unable to discover any fraud on his part or any attempt to cover up the property of his brother George. He was the absolute owner in fee of the site of the mill, and contributed as much to the erection of the mill as his brother, and, in our opinion, was legally, fairly, and equitably the owner of one-half, and had lawful right to sell his undivided half to Mr. Seward, who holds the same free from any claim on behalf of the creditors of George Ham.

We next inquire who was the legal and equitable owner of the other moiety of the mill. The means of Mrs. Ham were invested in the purchase of the mill from appellants, and with its destruction she and her husband were left destitute of money or property. The primary object with the citizens was to procure the erection of another mill, and they had the clear and undoubted right to have the title to such mill so vested as to secure its perpetuation. They were unwilling to contribute to the erection of a mill which would be sold upon execution to pay the debts of George W. Ham. They were under neither a legal nor moral obligation to provide for the payment of the debts of George W. Ham to appellants, and, hence, it was not fraudulent for them to have the title so vested as to defeat the payment of appellants' debt. The fact that Mrs. Ham was a married woman did not deprive her of the right and power to acquire a valid and legal title to either real or personal property by gift. The citizens required that the title to one-half of the property should be vested in her, and made this a condition upon which they would make a donation to aid in

the erection of the mill. We think that Mrs. Ham became the legal and equitable owner of one-half of the property in dispute, and, being the owner, she had the right to appoint her husband her agent to carry'on the business for her, provided such employment was in good faith and not merely colorable.

We make an extended quotation from the recent work of Bump on Fraudulent Conveyances, p. 269. He says :

"Creditors have no power to compel a debtor to labor, and earn the means to pay their demands. He may resign himself to hopeless and endless want, or he may limit his exertions to just such an extent as may be adequate to furnish him the means of a scanty subsistence, and in all this he violates no legal right of his creditors. The law allows even more than this. His first and most imperative duty is to support and maintain himself and family, from the proceeds of his labor. He is under no legal or moral obligation to appropriate these to the benefit of his creditors, and leave himself and his family to suffer hunger and want. Consequently he has the right to enter into a contract to labor for another in consideration of the support and maintenance of himself and family. If an attachment is laid in the hands of his employer, after a contract has been partially performed, he may refuse to complete it, and a new arrangement may be made for the purpose of protecting his subsequent earnings from the effect of such attachment. He is not permitted, however, to make an assignment of his future earnings with the intent to delay, hinder or defraud his creditors.

"NOT APPLY LABOR TO ACCUMULATION OF PROPERTY.—Although the law will not compel a debtor to labor and earn money to pay his debts, yet there is a strong moral obligation resting upon him to use the strength, skill and talents with which he is endowed for that purpose, and this obligation is one which the law to a certain extent recognizes and enforces. He has an election to labor or not as he may please, with which the law will not interfere. He is also countenanced by the law in the proper discharge of his duty to provide a maintenance and support for himself and his family. But beyond the necessary

Cooper *et al. v.* Ham *et al.*

wants of himself and his family, there is a limit which the law does not allow him to transcend. He is not permitted to treasure up a fund accruing from his labor or vocation, whatever it may be, and claim that it shall be protected for the benefit of himself or his family, against the demands of creditors. Every agreement or contrivance entered into with a view to deprive his creditors of his future earnings, and enable him to retain and use them for his own benefit and advantage, or to make a permanent provision for his family, is fraudulent and void. Although his creditors cannot compel him to labor for the purpose of satisfying their demands, yet they have a just claim in law upon the fruits of his labor performed.

"BUSINESS IN WIFE'S NAME.—The law does not permit him to carry on a business in the name of his wife, so as to invest the proceeds of his skill and labor in her name. If she has a separate estate she may employ him and compensate him for his services. Such employment, however, must be in good faith, and not merely colorable. If the character of an agent is assumed in an improper case, the law disregards it. An arrangement by which the husband acts as his wife's agent without any compensation, or for a compensation that is insufficient, is, in effect, an attempt to make a voluntary conveyance of the products of his skill and labor in her favor, and is void as against his creditors. She is entitled to her money with interest, and the balance will be appropriated to the payments of his debts."

The foregoing propositions of law are not entirely accurate, and the text is not fully supported by the cases cited. In support of the first paragraph of the above quotation, the following authorities are cited: *Leslie* v. *Joyner*, 2 Head, 514; *Griffin* v. *Cranston*, 1 Bosw. 281; *Holdship* v. *Patterson*, 7 Watts, 547; *Teeter* v. *Williams*, 3 B. Mon. 562; *Abbey* v. *Deyo*, 44 Barb. 374; *Tripp* v. *Childs*, 14 Barb. 85; *Gragg* v. *Martin*, 12 Allen, 498.

The ruling in *Leslie* v. *Joyner*, *supra*, was based upon the ruling in *Hamilton* v. *Zimmerman*, 5 Sneed, 39, where the court

said : " The debtor is certainly under a moral obligation to use all reasonable exertions to satisfy the just claims of creditors ; but he is under a positive obligation, in law as well as morals, to support and maintain his wife and infant children. This is his first and most imperative duty. But while this is so, and while he will be countenanced by the law in its proper discharge, he cannot make it the pretext for covering up and protecting from the just claims of creditors, any surplus fund accruing from his labor or vocation, whatever it may be."

In *Griffin* v. *Cranston, supra,* one partner sold and transferred to the other his interest in the business, on the condition that the latter should pay all the firm debts and the individual debts of the assigning partner created in the name of the firm, and the interest was worth less than the debts assumed ; and it was also agreed that the retiring partner and his wife were to work for the other for their board, unless future profits were earned ; and it was held that the assignment was not fraudulent, and the agreement for labor was valid.

In *Holdship* v. *Patterson, supra,* it was held, that a benefactor may provide for a friend the means of subsistence for himself and family without exposing his bounty to the debts or improvidence of the beneficiary. He has an individual right of property in the execution of the trust, of which he cannot be deprived by an execution against the trustee. The court say : " Though a right to the debtor's labor was given to an execution creditor by a provisional statute long since repealed, it exists not at the common law ; and the defendant was therefore at liberty to dispose of his services for his own purposes and on his own terms. His tangible earnings would become liable to execution for his debts ; but he was not under even a moral obligation to restrict his efforts exclusively to the liquidation of them. He might lawfully devote himself to the maintenance of his family only."

In *Teeter* v. *Williams, supra,* it was held, that a creditor cannot have a decree against one to whom his debtor has contracted for work and labor beyond the sum due ; nor can the

Chancellor compel the debtor to perform a contract for labor, that the creditor may have the benefit of the price. This was a proceeding by attachment, and it was held, that a sum actually due for labor might be attached. It was further held, that the Chancellor possessed no power to compel a person to perform a contract for labor; but that if the Chancellor could exercise such power of compulsion at all, he certainly would not fail to allow to the debtor, out of the proceeds of his labor, so much as was necessary for the support of himself and family, and would give the net balance only to the creditor.

The case of *Alley* v. *Deyo*, 44 Barb. 374, is reported in 44 N. Y. 343, and will be hereafter noticed.

The case of *Tripp* v. *Childs*, *supra*, was decided upon the ground of positive fraud, and need not be further noticed.

In *Gragg* v. *Martin*, *supra*, it was held, that an assignment of future wages, to be earned under an existing contract, if made for the purpose of preventing them from being attached by trustee process, is void; and the fact that it was made openly and for a good consideration is immaterial, if an actual intent to defraud is established.

In support of the second paragraph above quoted, the following authorities are cited: *Patterson* v. *Campbell*, 9 Ala. 933; *Waddingham's Ex'rs* v. *Loker*, 44 Mo. 132; *Isham* v. *Schafer*, 60 Barb. 317.

The case of *Patterson* v. *Campbell*, *supra*, was where the parent invested the proceeds of his labor in the purchase of real estate, and took the title in the name of his infant daughter. The court say: " The question then resolves itself into one of right, not of jurisdiction, and it is said the debtor has the moral right to appropriate the proceeds of his labor to the advancement of his children in preference to his creditors. Of the moral duty of the parent to provide for the support and education of his children, there can be no doubt, and perhaps as little, that it is paramount to the obligation to creditors; but the providing for support is quite a different thing from investing them with the title to property, which in most, if

not all cases, must necessarily be a secret trust enuring to the benefit of the parent."

In *Waddingham's Ex'rs* v. *Loker, supra,* it was held that the law will not permit a man to withdraw his property from his creditors. Nor can a man owing debts be permitted to devote his capital, industry, or credit to the accumulation of property, to be held by some third person for his own use or that of his family, to the exclusion of his creditors. In all such cases, the law intervenes and goes behind the fraudulent and secret transaction, and subjects the property or trust funds to the payment of just and legal demands; and it was also held that the property in controversy had been donated to the wife and daughters of the debtor by a benefactor, and that consequently the debtor had no interest therein which could be reached by his creditors.

The case of *Isham* v. *Schafer, supra,* has an important bearing upon the present case. The facts were, that Mrs. Isham inherited a tract of land upon which she and her husband resided; that a brick dwelling-house was erected upon the premises, Mrs. Schafer furnishing a portion of the money to build the same, and the defendant, Henry Schafer, furnished the balance and contributed his labor as a gift to his wife. The object of the suit was to subject such property to sale for the payment of a judgment which had been rendered against Henry Schafer, in part, for materials which had been used in the construction of said house. The court say: "In every such case, however, it must appear that the debtor has contributed something in the nature of property to the real estate of another. Something which the creditor had the right to claim as property, and which could be appropriated and converted into money, by legal process, to satisfy a debt or demand. If it was something else, for instance, the mere labor, or skill, of the debtor gratuitously bestowed, no such relief could be had on account of it. The law gives the creditor a lien and claim upon the property of his debtor—upon the fruits of his labor and skill, when received or earned—but no lien or claim upon his capacity to labor, or upon his skill and ingenuity. His labor

and skill, upon which a creditor has no lien, or claim of any kind, the debtor may, if he sees fit, give away to another, and the creditor can have no remedy against the recipient, if it is in fact a mere gift. And so it has been held that a husband, who acts as agent for his wife, and oversees her affairs gratuitously, does not thereby render his wife liable to his creditors for what such services might be worth, if compensation were to be made. *Buckley* v. *Wells,* 33 N. Y. 518."

In support of the above quoted third paragraph, the following authorities are cited: *National Bank* v. *Sprague,* 5 C. E. Green, 13; *Quidort's Adm'r* v. *Pergeaux,* 3 C. E. Green, 472; *Keeney* v. *Good,* 21 Penn. St. 349; *Pawley* v. *Vogel,* 42 Mo. 291; *Glidden* v. *Taylor,* 16 Ohio St. 509; *Feller* v. *Alden,* 23 Wis. 301; *Shackleford* v. *Collier,* 6 Bush, 149; *Ashhurst* v. *Given,* 5 Watts & S. 323; *Knapp* v. *Smith,* 27 N. Y. 277; *Buckley* v. *Wells,* 33 N. Y. 518; *Gage* v. *Dauchy,* 34 N. Y. 293; *Savage* v. *O'Neil,* 44 N. Y. 298; *Abbey* v. *Deyo,* 44 N. Y. 343.

In *National Bank* v. *Sprague, supra,* the following propositions of law were laid down by the court:

1. Although a husband may give to the wife her services and earnings as against his creditors, when she carries on a separate business, without his assistance, with her own means and on her own account, yet in all cases where a business is carried on by a husband and wife in co-operation, and the labor and skill of the husband are contributed and united with those of the wife, the business will be considered as that of the husband, and not that of the wife, and the proceeds will not be protected for her as against his creditors.

2. The fruits of the wife's labor and skill, under such circumstances, are not her separate property within the terms or intention of the act for the better securing the property of married women."

3. Even if that act gave a wife the capacity to accept a gift of property from her husband, she could not be allowed to retain such gift as against his creditors, when made under circumstances which would prevent it from being sustained in favor of a stranger.

4. That the circumstances proved an intent on the part of the husband and wife to take the title in her name for the purpose of defrauding his creditors, and that in such case the husband could not by assuming to act as the agent of his wife prevent such property from being subjected to sale for the payment of his debts.

In *Quidort's Adm'r* v. *Pergeaux, supra,* the property in question was purchased by and in the name of Mrs. Pergeaux for five thousand dollars, of which she paid in cash of her own money five hundred dollars, and there had been subsequently paid about three thousand dollars, the proceeds of a business which had been jointly carried on by and in the name of Mr. and Mrs. Pergeaux. The object of the suit was to subject the property to sale for the payment of the debts of Mr. Pergeaux. The Chancellor says : " If a married woman cannot carry on trade or business in her own name so that she can bind herself personally in reference thereto, but such power is confined to contracts relating to such separate estate as she may legally hold, then it follows, as a necessary consequence, that the business is the business of her husband, and the profits are his property. And, while a husband may, as against his creditors, allow his wife to have for her separate use the earnings of herself and the labor of their minor children, he may not give to her, to be invested in her own name, the proceeds of his own business, skill, and labor. Else it would follow that any married man who became embarrassed, could transfer his business to his wife, and continue it himself in her name, with all his skill and ability, and if she only took, or seemed to take, some part in the transaction of it, might invest the proceeds of his labor and management in the name of his wife, and set his creditors at defiance."

The facts in the case of *Keeney* v. *Good, supra,* were these: The plaintiff below was the wife of John M. Good, who owned certain lands on which a distillery was built. Becoming insolvent, Good made an assignment for the benefit of his creditors. The assignee sold the land to one Rheem for eleven hundred dollars, and by Rheem it was subsequently conveyed

to Mrs. Good, the present plaintiff, for the consideration of fifteen hundred dollars. Of this sum fifty dollars were paid at the time the deed was made, and the bonds and mortgage of both the husband and wife were afterward given for the balance. About one thousand dollars of principal and interest seems to have been paid on the lands. Immediately after the deed to Mrs. Good, she and her husband made a written agreement that the husband should carry on the business of farming and distilling in her name, accounting to her for the profits and receiving from her wages at the rate of twenty dollars per month. While he was doing business under this agreement, he bought a lot of hogs, brought them to the distillery, and fed them there for a time. The defendant levied on them as the husband's property, and the wife brought this action of trespass. BLACK, C. J., speaking for the court, said: "An insolvent man is well protected in Pennsylvania. The barbarous system of imprisonment for debt is totally abolished, and thrown aside among the rubbish of the dark ages. He can retain real property or goods to the value of three hundred dollars, which his creditors may not touch. He cannot be prevented from applying the fruits of his personal industry to the maintenance and education of his family; for the wages of his labor are not liable to attachment. But after supporting his family, he must give the best exertions of his mind and body to his creditors. This is but his reasonable duty—a duty sanctioned by all laws, moral, civil, and divine. No effectual mode of evading it has yet been invented. The usual device of covering the property of the debtor under the name of some friend, or a member of his family, will only answer the purpose as long as it remains undiscovered. I need not say how deeply all such shams are branded by the law with the marks of its detestation."

In *Pawley* v. *Vogel, supra,* it was held that the doctrines of equity touching settlements of money or property in trust for the sole and separate use of the wife relate purely to property that belongs to the wife before marriage, or which may have been given or bequeathed to her after marriage and expressly

to her sole and separate use by the creation of a trust for that purpose. In such case, a proper instrument, based upon a valuable consideration, to the effect that she may carry on a separate trade on her sole account in the name of her trustee, may be protected at law and · may be enforced in equity, for the benefit of her husband, against him and his creditors ; but a voluntary agreement of this kind will not be good against his creditors. And neither law nor equity will permit an insolvent person, in the absence of any instrument like that mentioned, to carry on his own trade, with his own money, or with moneys that were donated by himself, in the name and under the cover of being his wife's trustee, for their common advantage. As between the parties themselves, a voluntary settlement upon the wife may be upheld in equity, and where the husband is not indebted at the time of making it, such settlement cannot be impeached by subsequent creditors merely on the ground of its being voluntary. But if he were indebted at the time, or if it were made with a view of being indebted at a future time, it will be void against creditors prior and subsequent.

The facts upon which the ruling in *Glidden* v. *Taylor, supra,* was based were briefly these : A husband, who had failed in manufacturing business, commenced business anew with the money of his wife, with her consent, and carried on the business, professedly as her agent, for years, making large profits therefrom. A principal source of the profits was the personal services and skill of the husband. The wife gave no personal attention to the business. There was no contract between her and her husband as to his compensation, and no accounts were kept between the parties. Part of the proceeds of the business was applied to the support of the family, part used by the husband, and part invested in real estate and personal property in the name of the wife. In a suit by the creditors of the husband, to subject the property so purchased to the payment of his debts, it was held : 1. The wife cannot claim the whole of the property as profits arising from her separate money. 2. Where she thus suffers her money to be employed

by the husband and blended with his earnings so that it cannot be separated, the most favorable position she can be allowed to assume, is that of a preferred creditor in equity, and, as such, entitled to her money and interest. The court say :

" It is further to be noted that the difficulty of making a division is in no way attributable to the creditors. They are entitled to have the property of the husband appropriated to the payment of his debts, and if the wife authorizes or permits her money to be so mixed with the products of the business and industry of her husband that it cannot be separated, this furnishes no reason why she should gain and the creditors lose thereby.

" Without entering into an exposition of the consequences that would follow the adoption of a rule sustaining the present claim of Mrs. Taylor, it is sufficient to say that we are satisfied that sound public policy and the settled principles of law and equity alike forbid its adoption; and that where a wife thus suffers her own money to be employed by her husband, and blended with his earnings so that it cannot be separated, though the business may be conducted in her name, the most favorable attitude she can be allowed to assume, in a controversy with his creditors, is that of a creditor in equity. At law, she can, of course, have no standing as a creditor.

" The arrangement between the husband and wife, whereby he undertook to carry on business in her name and for her exclusive benefit, was, in effect, an attempt to make a voluntary settlement of the products of his skill and industry in favor of his wife ; and the purchase of the property, and its conveyance to her was but the carrying out of the arrangement.

" The principle of the arrangement would be the same whether it embraced property which he had already acquired, or only his future acquisitions; and, if the arrangement be valid as against creditors for the period of about four years that elapsed from the time of its date to the time of the trial, it may be continued during the joint lives of the parties, if they so elect ; and if the husband should survive the wife, no

good reason is perceived why, if he should choose to do so, he might not prolong the arrangement for the benefit of her legal representatives."

In *Feller* v. *Alden, supra,* it was held : 1. A wife owning land as her separate estate may cultivate the same by means of the labor of her husband and minor children, and the legal title to the products and proceeds thereof will still be in her, so that they cannot be levied upon under an execution against the husband. 2. Whether a court, in a proper proceeding in equity, will apportion such proceeds and products with reference to the proportionate value of the wife's capital, and the labor and services of the husband and minor children, and subject a due portion thereof to the payment of the husband's debts, is a question not raised in this action. 3. The mere fact that the wife employs the husband's services in cultivating her land is not proof of an attempt to defraud his creditors. 4. Money placed by a wife in her husband's hands to be invested for her does not thereby become his property.

The court, in speaking of the rights of the wife, say : "For, if the farm were really the separate estate of the wife, as we have already said, the statute expressly declares that she may hold and enjoy it, with the rents and profits, in the same manner and with the like effect as though she were unmarried. It would seem to follow from this, that she might cultivate the farm, and manage the personal property, by means of any agency which any other owner of such property might employ, and the produce thereof, with the increase of stock, would belong to her."

In *Shackleford* v. *Collier, supra,* it was decided that, although a *feme covert* may acquire the possession of property as separate estate, yet if its acquisition was in consideration of the money or property of the husband, which was subject to the claims of his antecedent creditors, the wife's claim will generally be made to yield to those of the creditors ; and the real and personal estate in controversy in this case being in part the separate estate of the wife, and the remainder subject to the husband's

creditors, it was held that so far as the separate estate of the wife entered into the purchase or production of the real and personal property in controversy, her title thereto was valid and sustained ; and as the savings by the *feme covert* out of her separate property are hers, the products and accumulations of her separate estate must be included in estimating her present interest in said property ; and that after securing the title and possession of the wife as her separate estate, the residue was subject to the claim of the husband's creditors.

The case of *Ashhurst* v. *Given, supra,* involved the rights of a testator, trustee, and *cestui que use.* A large estate was devised to Samuel Given, in trust for various persons, and it was provided that the trustee, as compensation for his services, was to be allowed a reasonable support out of the trust funds for his personal services rendered in conducting and managing the trust estate. The reason given by the testator for not devising any part of his estate to his son Samuel was to prevent the estate devised to his children and heirs from being appropriated to those debts which he contracted in an unfortunate business.

The estate was so managed by the trustee that it greatly increased in value. The creditors of Samuel, by this suit, sought to reach the estate devised to his children, and if this could not be done, then that the value of his services should be subjected to the payment of his debts. It was held that, as the testator was under neither a legal nor moral obligation to pay his son's debts, he had the right to devise property to his children in such a manner as to prevent the creditors of his son from subjecting the same to the payment of their debts. In reference to the services of Samuel as such trustee, the court say :

" Neither can it advance such claim on the part of Samuel's creditors, that the trust estate may be greatly enhanced by his personal services, and that his services may be worth much more than his support or maintenance. A man, though indebted and wholly unable to pay anything, may dispose of his personal services at what price he pleases, and his creditors

Cooper *et al. v.* Ham *et al.*

cannot object to his doing so. If he be content to give them for his mere support and maintenance, without more, he has unquestionably the right to do so; though I would say, if he has it in his power by means of his personal services, even when he is destitute of all other means, to support himself and at the same time to pay his creditors, he ought to do so. A proper sense of moral obligation requires it of him. But if he does not choose to do so, it cannot be tolerated for a moment that his creditors shall be permitted to seize upon whatever has been committed to his possession and care, to be managed expressly for the use and benefit of others, and not for himself."

In *Knapp* v. *Smith*, 27 N. Y. 277, the court say : " Where the husband is indebted and insolvent, as was the case here, there is generally more or less reason to suspect that such arrangements are adopted as a cover to disguise the substantial ownership of the husband and to defraud the creditors. Whether, in a given case, the transaction is sincere and *bona fide*, or a colorable device to cheat the creditors of the husband, is a question of fact, to be determined by the jury or other forum entrusted with the decision of such questions. In this case, the referee has found the facts necessary to show title in the plaintiff to the property in question, and he has omitted to find that her title was infected with fraud. On the contrary, by stating that the acts of the husband were done in the character of the agent of the plaintiff, and that she was the owner of the cattle which were seized on the execution, he has virtually negatived the allegation of fraud. It is not our duty or right to review the testimony, with a view to pass upon the correctness of his conclusion, and we, therefore, express no opinion upon the evidence in this case."

In the case of *Buckley* v. *Wells*, 33 N. Y. 518, the court say : " The referee does not find that there was any fraud in the transaction. Indeed, it would be difficult to predicate fraud upon such an arrangement. The wife of an insolvent man, having a small separate property, derived from her mother, is naturally desirous that her husband may be engaged in some business, by which, in connection with her estate, a

support may be provided for a large family of children. The husband has been a merchant. The wife is willing to embark her property in that business with which her husband was familiar, hazardous though it may be; and she empowers and authorizes him to carry on business for her and on her money and credit, holding himself out to the world as her agent. There was nothing fraudulent in that. There is no law in this State which mortgages to the creditor either the person or the labors of his debtor—no longer a law which consigns the innocent and unfortunate to confinement within prison walls. The duty rests upon him to use his best efforts for the payment of his debts; but there is a duty which he owes alike to the public and to his family which is sacred, and that duty is, to provide for the nurture, education and support of his children. He is said to be worse than an infidel, who neglects it. In seeking employment for that purpose, he may apply to the wife, if she have a separate estate, as well as to a stranger. If the law allows her to hold property—her own at her marriage, or coming from others besides her husband and free from his control—of necessity, she must be permitted to manage it herself, or she may employ others to act for her. As to that separate estate, she and her husband are as distinct before the law as if the marital relation did not exist. As to that property she acts as a *feme sole,* and may deal with her husband as with a stranger, and may, therefore, necessarily employ him and compensate him for its management."

In *Gage* v. *Dauchy,* 34 N. Y. 273, the court say : " While the legislature leaves the husband the right and makes it his duty to live with his wife, he must necessarily live upon her farm, if they have no other place to live. Surely it could not have been the object of the legislature to deprive the wife of the benefit of his services. The idea that there should be an agreement between them as to wages is absurd; for the legislature has not yet changed the common law so as to allow them to make a business contract with each other. Certainly, there is no way provided to enforce it. But, even upon grounds of equity, there is no reason why the husband should be enti-

tled to the growing crops which he helps to cultivate on her farm. The law still requires him to support his wife and family. If it was competent for the husband and wife to make an agreement in respect to his labor, they might agree that he should bring the amount of his wages into the house to be expended in providing them with food and clothing. As he is, by law, bound to provide for his wife and family, the whole support of the family might be cast upon him, while she used the rents, issues and profits of her separate estate to enlarge her wardrobe, or to engage in some new business which the law allows her to carry on, on her sole and separate account, without interference of her husband.

"If I am not mistaken, this case is controlled by the authority of *Knapp* v. *Smith*, in this court, already referred to. There is no difficulty in holding that, at law, a married woman may now own personal property, as against her husband. But her title is always open to inspection, and may be set aside by the court or jury in favor of those who have a right to challenge it for fraud. The creditors cannot reach it upon the ground that it is the husband's, as against his wife, but only upon the ground of fraud."

In the case of *Abbey* v. *Deyo*, 44 N. Y. 343, the court say: "In *Buckley* v. *Wells*, 33 N. Y. 518, it was decided that a married woman could manage her separate property through the agency of her husband, and was entitled to the profits of a mercantile business, conducted by her husband in her name, when the capital was furnished by her, and he had no interest but that of an agent. It was further held that the application of an indefinite portion of the income to the support of her husband did not impair the wife's title to the property. While the law does not prohibit her from doing so, and where the property which is the subject of dispute does not come from him, this circumstance furnishes no evidence of fraud. In arguing this point, the appellant's counsel insists that the services, the time and talents of the husband are valuable, and he has no more right to give them to his wife, as against his creditors, than to give to her his property to their preju-

·dice. The one, he says, is as much their property as the other. This argument is entirely unsound. The property of a debtor, by the laws of all commercial countries, belongs to his creditors. He must be just before he is generous. He must pay before he gives. Not so with his talents and his industry. Whether he has much, or little, or nothing, his first duty is the support of his family. The instinctive impulse of every just man holds this to be the first purpose of his industry. The application of the debtor's property is rigidly directed to the payments of his debts. He cannot transport it to another country, transfer it to his friend, or conceal it from his creditor. Any or all of these things he may do with his industry. He is at liberty to transfer his person to a foreign land. He may bury his talent in the earth, or he may give it to his wife or friend. No law, ancient or modern, of which I am aware, has ever held to the contrary. No country, unless both barbarous and heathen, has ever authorized the sale of the person of a debtor for the satisfaction of his debts."

We proceed to make an application of the doctrines laid down in the foregoing authorities to the present case, but before doing so, we will re-state the positions assumed by counsel for appellants.

It is claimed that the entire mill property belongs to George Ham, and that the same should be subjected to sale for the payment of appellants' judgment. When the mill was purchased and put up, George Ham was destitute of property and means. He did not put into the mill anything that was subject to sale upon execution, or which could be reached by attachment or proceedings supplementary to execution. It is abundantly established by the foregoing authorities that the citizens had the right to impose, as a condition upon which they would aid in the construction of such mill, that the title thereto should be vested in such manner as would prevent the appellants from subjecting the same to sale for the payment of their debt against George Ham. They chose to have it vested in Martin G. Ham and Mrs. Frances A. Ham. Such arrangement constitutes no evidence of fraud. If George

Ham had possessed money or property which had been put into the mill, his creditors would have the right to complain. We think it is very clear, both on principle and by authority, that the legal title to such property was in Martin G. Ham and Mrs. Frances A. Ham.

But it is argued that the fact that George Ham acted as the agent of his wife in the purchase, erection, and operating of the mill, affords very strong if not conclusive evidence, that the transaction is fraudulent. The position is wholly unfounded. Mrs. Ham had the undoubted right to employ her husband to act as her agent in operating the mill, and such employment is not proof of an attempt on her part to defraud his creditors. It is equally well settled, that she is entitled to the proceeds and profits of the mill.

It is further insisted that George Ham has no legal right to give his services and skill to the management of the business and property of his wife; in other words, that his personal services and skill, and the products thereof, belong to his creditors.

It is firmly settled by the foregoing authorities, that the first and highest obligation of a husband is to provide for the support, maintenance, and education of his family, and that after this has been accomplished, he should give the best exertions of his mind and body to accumulate means for the payment of his debts. But, while this moral obligation rests upon a married man, there is no means known to the law by which it can be enforced.

George Ham has the right to give his personal services and skill to the management of his wife's property, without any other compensation than the support and maintenance of himself and family. In the present case, there has been no accumulation of other property resulting from the profits of the mill, nor has the mill been paid for; but there are debts against it, and liens resting upon it. If these debts are paid, and the liens discharged, the question which is considered in several of the foregoing cases may arise, and that is, whether the husband can, by his labor and skill, add to and increase

the separate property of his wife, without giving his creditors the right to have the proceeds and profits apportioned between themselves and the wife. Or, if the earnings of the husband should be invested in other property, in the name of his wife, or if there should be money coming to him for his services and skill, which could be reached by a proceeding in attachment or supplementary to execution, the question discussed in many of the above cases would arise; but these questions are not now before us, and we decide nothing in reference thereto.

We have been very greatly aided in the examination of the important questions presented in the record by the very elaborate and able briefs with which we have been furnished.

We are entirely satisfied with the ruling of the court below. We think the appellants have no right to subject the property in question to sale for the payment of their judgment. Inasmuch as George Ham did not put into the mill anything which could have been sold upon execution in satisfaction of their judgment, they have not been defrauded; and as there is no accumulated fund resulting from his labor, and as the proceeds of his personal services and skill have been applied to the support of the family and the payment of the debts contracted in erecting and operating the mill, there is no tangible property which is subject to sale upon execution.

The judgment is affirmed, with costs.