## MILLER *v.* PECK *et al.*

Decided April 30, 1881.

1. A married woman having personal property, which she is allowed to hold by statute as her separate property, may barter and trade with reference thereto through her husband as her agent, and will be entitled to the increase thereof, though living with her husband.

2. Such a married woman may in her own name proceed under the statute of interpleader to assert her right to such property.

3. Although her husband may have given his own labor in such barter and trade, and may have used the labor of his horse therein, in the absence of the fraud of the wife, this does not change the character of the property; and the property is not liable for the debts of the husband.

Writ of error to a judgment of the circuit court of the county of Wetzel, rendered on the 14th day of October, 1878, in an action in said court then pending, wherein Hannah Miller was plaintiff and Andrew Peck, D. B. Miller and J. W. Kyser were defendants, allowed upon the petition of said Miller.

Hon. A. B. Fleming, judge of the second judicial circuit, rendered the judgment complained of.

MOORE, PRESIDENT, furnishes the following statement of the case:

On the 9th day of October, 1878, Hannah Miller filed in the circuit court of Wetzel county a petition under chapter 107 of Code of 1868, whereby she claimed one bay horse and about forty or fifty cords of white oak oil barrel heading wood as her separate property, which had previously been levied on as the property of her husband, D. B. Miller, with whom she was living, by virtue of a certain writ of *fieri facias*, sued out upon a judgment rendered by the county court in favor of Andrew Peck against said D. B. Miller and J. W. Kyser. By consent of all parties a jury was waived, and the matters arising under the petition were submitted for the decision of the court in lieu of a jury. On the 14th day of October, 1878, the court decided, that the bay horse was the separate property of said Hannah Miller, and not liable for the debts of her husband, and ordered it to be "released from the levy in the petition set up, and that she have and hold said bay horse;" and "that the white oak oil barrel heading wood described in the petition is liable for the payment of the debt of said D. B. Miller, levied thereon, as set forth in the petition, and that said petitioner, Hannah Miller, is not entitled to have and to hold the same as her separate property;" and ordered " that she release the same, and that the same be subjected under the levy described in the petition to the payment of the execution levied thereon," and that she recover costs about her petition, &c., expended.

Whereupon petitioner objected to the said judgment, and moved the court to set aside the same as contrary to the law and the evidence, which motion the court overruled ; the pe-

titioner excepted thereto, and took her bill of exceptions.

It appears from the bill of exceptions, that the petitioner testified, that she was the wife of said D. B. Miller, having married him several years before and prior to the transactions stated thereafter in the bill of exceptions; and during all that time she and her husband lived together as man and wife in said Wetzel county; that during the spring of 1878 she received from her father, who resided in the State of Pennsylvania, his check for $118.00, which was sent to her in said Wetzel county by her father, and given by her to her husband to get it cashed; that prior to receiving a check for $118.00, she received in like manner from her father $250.00. This money she gave to her husband, D. B. Miller, and told him to take the money and invest it and do the best he could for her with it; that her husband invested " considerable of the money in logs." The residue of what she received from her father was by her husband invested in logs and standing timber growing upon lands some five miles from the mouth of Fishing creek, in Wetzel county; that said logs were scattered along said creek, some five miles from its mouth, in said county; that her husband ran said logs down said creek to its mouth, and procured the same to be sawed upon shares at the saw mill of S. J. Robinson, and sold so much of said lumber, as was left after paying for sawing, to Oxnard & Hall, who paid her husband therefor, and that he turned said money over to her, and that she afterwards handed back to her husband the proceeds of said logs, and directed him to buy a horse with the money; that afterwards, August 27, 1878, said husband with part of said money, purchased of Irene Obers the horse in controversy, for which he paid $40.00, out of said money, and took Obers's receipt therefor in her own name; that the residue of the proceeds of said logs was also invested in growing timber, in said county, which grew a short distance from said creek and some five miles from its mouth. This timber was purchased in the wife's name from Jacob Witchey, at the price of $91.50, there being sixty-one trees at $1.50 a tree, and as appears by Witchey's receipt therefor, the sum of $81.00 was paid by Miller for his wife to Witchey, and that the residue of said money, for said timber, was

afterwards paid by said husband to said Witchey ; that the said husband employed hands by his wife's orders, and felled a large portion of the said growing timber, and with that and his own labor, he working all the time, manufactured said trees into oil barrel heading wood, and then hauled it some four miles to near the mouth of said creek, and piled the same on the bank thereof; and that is the same oil barrel heading wood, which was levied on as the husband's property, as in the petition mentioned. She further testified, that she made her husband her agent for the transaction of said business, and that he was her agent in all the foregoing transactions, but there was no written contract or memorandum touching such appointment or agency. It was further proven, that about all this business the said husband contributed his time and his labor ; that he managed and conducted the business and assisted with his labor in the felling of said trees, and manufactured them into said oil barrel heading wood, and that he assisted in the hauling thereof, and that the same was hauled by three teams, one of which was made up by the horse in controversy, and the other horse was furnished by her husband ; that the husband received no compensation, and was to have no compensation for his management of said business, or for his labor about the same, or for the horse furnished by him ; that there was from forty to fifty cords of said oil barrel heading wood so hauled and on the bank of the creek, and worth, where it lay, from $6.50 to $7.00 per cord. Jacob Witchey corroborated the testimony of the wife as to the transaction with him, and states that the whole of "the said $91.50, had been paid to D. B. Miller in the name of Hannah Miller." The writ of *fi. fa.* with the returns thereon, the indemnifying bond and suspending bond were also given in evidence.

The foregoing being all the facts proven, the court overruled the objections of the petitioner to the judgment against her, and the motion to set the same aside, to which ruling the petitioner, Hannah Miller, excepted, and obtained the writ of error and *supersedeas*, which brings the case before this Court.

*M. R. Crouse* and *T. P. Jacobs* for plaintiff in error, cited the following authorities: 2 Leigh 183 ; Code ch. 66, §§ 1, 2,

3 ; 13 W. Va. 572; 17 Gratt. 503; 55 Me. 189 ; 43 Ala. 193;
13 Minn. 52; 1 Tuck. Com. bk. 1, p. 112; 23 N. Y. 505; 40
Conn. 120 ; Wells Sep. Prop. Mar. Women, p. 507, § 559 ;
11 Mod. 150; 25 Mich. 200 ; Story Partn. §§ 11, 12; 2 Story
Eq. §§ 1385–1387 ; Roper Hus. & Wife ch. 18, § 4; 33 N. Y.
520; 34 N. Y. 297 ; 44 N. Y. 348 ; 44 Barb. 381; 4 Rob.
136 ; 54 Ga. 266; 75 Ill. 451; 27 N. Y. 277; 29 Pa. 46 ;
11 Mich. 492; 49 Ind, 394; 33 Vt. 457.

*E. C. Snodgrass & Son*, for defendants in error cited the
following authorities : Code ch. 66, § 13 ; 12 .W. Va. 350;
14 W. Va. 338 ; 2 Story Eq. §§ 1381–1383; 1 Min. Inst. 295,
317, 318; 1 Tuck. Com. bk. 1, pp. 112, 113, 115, 116;
Roper Hus. & Wife 140–172; Story Eq. §§ 1372, 1386, 1387.

MOORE, PRESIDENT, announced the opinion of the Court :

It is insisted by the plaintiff in error, Hannah Miller, that
the court erred in giving judgment against her for the white
oak barrel heading wood, and deciding that the same was lia-
ble to the payment of the judgment against her husband and
J. W. Kyser in favor of Andrew Peck.

The consideration of the case as presented to us by the
record and argument necessarily involves the questions of hus-
band's agency in the business affairs of his wife relative to her
separate property, and to what extent he can devote his labor
and time to her business affairs, and perhaps also to what ex-
tent he may use his own property in her separate business as
against creditors. These questions have been considered by
many courts, and there is a diversity of opinions and conclu-
sions thereon, as is well pointed out by Mr. Wells in his val-
uable treatise on "Separate Property of Married Women." It
is not my purpose or duty to trace the history of the law from
its beginning to the present, touching the rights of married
women as to their separate property, and to what extent credi-
tors of the husband may be affected thereby ; but to grasp the
question presented by this case, it will be necessary to con-
sider some of the many cases in reference thereto and bearing
thereon, and to enable me to be as brief as possible, I will first
quote *in extenso* the *epitome* in review of the leading authori-
ties made by Judge Buskirk, in the case of *Cooper et. al.* v.
*Ham et. al.*, 49 Ind. 393. He begins by saying:

"We make an extended quotation from the recent work of Bump on Fraudulent Conveyances, p. 269. He says:

" 'Creditors have no power to compel a debtor to labor, and earn the means to pay their demands. He may resign himself to hopeless and endless want, or he may limit his exertions to just such an extent as may be adequate to furnish him the means of a scanty subsistence, and in all this he violates no legal right of his creditors. The law allows even more than this. His first and most imperative duty is to support and maintain himself and family from the proceeds of his labor. He is under no legal or moral obligation to appropriate these to the benefit of his creditors, and leave himself and his family to suffer hunger and want. Consequently he has the right to enter into a contract to labor for another in consideration of the support and maintenance of himself and family. If an attachment is laid in the hands of his employer, after a contract has been partially performed, he may refuse to complete it, and a new arrangement may be made for the purpose of protecting his subsequent earnings from the effect of such attachment. He is not permitted, however, to make an assignment of his future earnings with the intent to delay, hinder or defraud his creditors.

" '*Not Apply Labor to Accumulation of Property.*—Although the law will not compel a debtor to labor and earn money to pay his debts, yet there is a strong moral obligation resting upon him to use the strength, skill and talents with which he is endowed for that purpose, and this obligation is one which the law to a certain extent recognizes and enforces. He has an election to labor or not as he may please, with which the law will not interfere. He is also countenanced by the law in the proper discharge of his duty to provide a maintenance and support for himself and family. But beyond the necessary wants of himself and family, there is a limit which the law does not allow him to transcend. He is not permitted to treasure up a fund accruing from his labor or vocation, whatever it may be, and claim that it shall be protected for the benefit of himself and family, against the demands of creditors. Every agreement or contrivance entered into with a view to deprive his creditors of his future earnings, and enable him to retain and use them for his own benefit and ad-

vantage, or to make a permanent provision for his family, is fraudulent and void. Although his creditors cannot compel him to labor for the purpose of satisfying their demands, yet they have a just claim in law upon the fruits of his labor.

" 'Business in Wife's Name.—The law does not permit him to carry on a business in the name of his wife, so as to invest the proceeds of his skill and labor in her name. If she has a separate estate she may employ him and compensate him for his services. Such employment, however, must be in good faith, and not merely colorable. If the character of an agent is assumed in an improper case, the law disregards it. An arrangement, by which the husband acts as his wife's agent without any compensation or for a compensation that is insufficient, is, in effect, an attempt to make a voluntary conveyance of the products of his skill and labor in her favor, and is void as against his creditors. She is entitled to her money with interest, and the balance will be appropriated to the payment of his debts.' "

Judge Buskirk then proceeds as follows :

"The foregoing propositions of law are not entirely accurate, and the text is not fully supported by the cases cited. In support of the first paragraph of the above quotation, the following authorities are cited: Leslie v. Joyner 2 Head, 514 ; Griffin v. Cranston, 1 Bosw. 281; Holdship v. Patterson, 7 Watts, 547 ; Teeter v. Williams, 3 B. Mon, 562 ; Abbey v. Deyo, 44 Barb. 374 ; Tripp v. Childs, 14 Barb. 85 ; Gragg v. Martin 12 Allen, 498.

"The ruling in Leslie v. Joyner, supra, was based upon the ruling in Hamilton v. Zimmerman, 5 Sneed 39, where the court said :

" 'The debtor is certainly under a moral obligation to use all reasonable exertions to satisfy the just claims of creditors; but he is under a positive obligation, in law as well as morals, to support and maintain his wife and infant children. This is the first and most imperative duty. But while this is so, and while he will be countenanced by the law in its proper discharge, he cannot make it the pretext for covering up and protecting from the just claims of creditors any surplus fund accruing from his labor or vocation, whatever it may be.'

"In Griffin v. Cranston, supra, one partner sold and trans-

ferred to the other his interest in the business, on the condition that the latter should pay all the firm debts and the individual debts of the assigning partner created in the name of the firm, and the interest was worth less than the debts assumed; and it was also agreed, that the retiring partner and his wife were to work for the other for their board, unless future profits were earned ; and it was held that the assignment was not fraudulent, and the agreement for labor was valid.

"In *Holdship* v. *Patterson, supra,* it was held, that a benefactor may provide for a friend the means of subsistence for himself and family without exposing his bounty to the debts or improvidence of the beneficiary. He has an individual right of property in the execution of the trust, of which he cannot be deprived by an execution against the trustee. The court say : 'Though a right to the debtor's labor was given to an execution-creditor by a provisional statute long since repealed, it exists not at the common law'; and the defendant was therefore at liberty to dispose of his services for his own purposes and on his own terms. His tangible earnings would become liable to execution for his debts ; but he was not under even a moral obligation to restrict his efforts exclusively to the liquidation of them. He might lawfully devote himself to the maintenance of his family only.'

In *Teeter* v. *Williams, supra,* it was held that a creditor cannot have a decree against one to whom his debtor has contracted for work and labor beyond the sum due ; nor can the chancellor compel the debtor to perform a contract for labor, that the creditor may have the benefit of the price. This was a proceeding by attachment, and it was held that a sum actually due for labor might be attached. It was further held that the chancellor possessed no power to compel a person to perform a contract for labor ; but that if the chancellor could exercise such power of compulsion at all, he certainly would not fail to allow to the debtor, out of the proceeds of his labor, so much as was necessary for the support of himself and family, and would give the net balance only to the creditor.

"The case of *Alley* v. *Deyo,* 44 Barb. 374, is reported in 44 N. Y. 343, and will hereafter be noticed.

"The case of *Tripp* v. *Childs, supra,* was decided upon the ground of positive fraud and need not be further noticed.

"In *Gragg* v. *Martin, supra*, it was held that an assignment of future wages, to be earned under an existing contract, if made for the purpose of preventing them from being attached by trustee-process, is void; and the fact that it was made openly and for a good consideration is immaterial, if an actual intent to defraud is established.

"In support of the second paragraph above quoted, the following authorities are cited: *Patterson* v. *Campbell*, 9 Ala. 933; *Waddingham's Ex'rs* v. *Loker*, 44 Mo. 132; *Isham* v. *Schafer*, 60 Barb. 317.

"The case of *Patterson* v. *Campbell, supra*, was where the parent invested proceeds of his labor in the purchase of real estate, and took the title in the name of his infant daughter. The court say : 'The question then resolves itself into one of right, not of jurisdiction, and it is said the debtor has the moral right to appropriate the proceeds of his labor to the advancement of his children in preference to his creditors. Of the moral duty of the parent to provide for the support and education of his children there can be no doubt, and perhaps as little, that it is paramount to the obligation to creditors, but the providing for support is quite a different thing from investing them with the title to property, which in most, if not all, cases must necessarily be a secret trust enuring to the benefit of the parent.'

"In *Waddingham's Ex'rs* v. *Loker, supra*, it was held that the law will not permit a man to withdraw his property from his creditors. Nor can a man owing debts be permitted to devote his capital, industry, or credit to the accumulation of property, to be held by some third person for his own use or that of his family, to the exclusion of his creditors. In all such cases the law intervenes and goes behind the fraudulent and secret transaction, and subjects the property as trust-funds to the payment of just and legal demands; and it was also held that the property in controversy had been donated to the wife and daughters of the debtor by a benefactor, and that consequently the debtor had no interest therein which could be reached by his creditors.

"The case of *Isham* v. *Schafer, supra*, has an important bearing upon the present case. The facts were, that Mrs. Isham inherited a tract of land upon which she and her husband re-

sided; that a brick dwelling house was erected upon the premises, Mrs. Schafer furnishing a portion of the money to build the same, and the defendant, Henry Schafer, furnished the balance and contributed his labor as a gift to his wife. The object of the suit was to subject such property to sale for the payment of. a judgment, which had been rendered against Henry Schafer, in part for materials which had been used in the construction of said house. The court say: 'In every such case, however, it must appear that the debtor has contributed something in the nature of property to the real estate of another. Something which the creditor had the right to claim as property, and which could be appropriated and converted into money by legal 'process, to satisfy a debt or demand. If it was something else, for instance the mere labor or skill of the debtor gratuitously bestowed, no such relief could be had on account of it. The law gives the creditor a lien and claim upon the property of his debtor, upon the fruits of his labor and skill, when received or earned, but no lien or claim upon his capacity to labor, or upon his skill and ingenuity. His labor and skill, upon which a creditor has no lien or claim of any kind, the debtor may, if he sees fit, give away to another, and the creditor can have no remedy against the recipient, if it is in fact a mere gift. And so it has been held that a husband, who acts as agent for his wife and oversees her affairs gratuitously, does not thereby render his wife liable to his creditors for what such services might be worth, if compensation were to be made. *Buckley* v. *Wells*, 33 N. Y. 518.'

"In support of the above quoted third paragraph, the following authorities are cited: *National Bank* v. *Sprague*, 5 C. E. Green 13; *Quidort's adm'r* v. *Pergeaux*, 3 C. E. Green 472; *Keeny* v. *Good*, 21 Pa. St. 349; *Pawley* v. *Vogel*, 42 Mo. 291; *Glidden* v. *Taylor*, 16 O. St. 509; *Feller* v. *Alden*, 23 Wis. 301; *Shackleford* v. *Collier*, 6 Bush 149; *Ashhurst* v. *Given*, 5 Watts & S. 323; *Knapp* v. *Smith*, 27 N. Y. 277; *Buckley* v. *Wells*, 33 N. Y. 518; *Gage* v. *Dauchy*, 34 N. Y. 293; *Savage* v. *O'Neil*, 44 N. Y. 298; *Abbey* v. *Deyo*, 44 N. Y. 343.

"In *National Bank* v. *Sprague, supra,* the following propositions of law were laid down by the court:

" '1. Although a husband may give to the wife her services

and earnings as against his creditors, when she carries on a separate business without his assistance with her own means and on her own account, yet in all cases where a business is carried on by a husband and wife in co-operation, and the labor and skill of the husband are contributed and united with those of the wife, the business will be considered as that of the husband, and not of the wife, and the proceeds will not be protected for her as against his creditors.

"'2. The fruits of the wife's labor and skill under such circumstances are not her separate property within the terms or intention of the act for the better securing the property of married women.

"'3. Even if the act gave a wife the capacity to accept a gift of property from her husband, she could not be allowed to retain such gift as against his creditors, when made under circumstances which would prevent it from being sustained in favor of a stranger.

"'4. That the circumstances proved an intent on the part of the husband and wife to take the title in her name for the purpose of defrauding his creditors, and that in such case the husband could not by assuming to act as the agent of his wife prevent such property from being subjected to sale for the payment of his debts.'

"In Quidort's adm'r v. Pergeaux, supra, the property in question was purchased by and in the name of Mrs. Pergeaux for $5,000.00, of which she paid in cash of her own money, $500.00, and there had been subsequently paid about $4,000.00, the proceeds of a business which had been jointly carried on by and in the name of Mr. and Mrs. Pergeaux. The object of the suit was to subject the property to sale for the payment of the debts of Mr. Perdeaux. The Chancellor says: 'If a married woman cannot carry on trade or business in her own name, so that she can bind herself personally in reference thereto, but such power is confined to contracts relating to such separate estate as she may legally hold, then it follows as a necessary consequence, that the business is the business of her husband, and the profits are his property. And while a husband may, as against his creditors, allow his wife to have for her separate use the earnings of herself and the labor of their minor children, he may not give to her, to be invested

in her own name, the proceeds of his own business, skill and labor. Else it would follow that any married man, who became embarrassed, could transfer his business to his wife, and continue it himself in her name with all his skill and ability, and if she only took, or seemed to take, some part in the transaction of it, might invest the proceeds of his labor and management in the name of his wife. and set his creditors at defiance.'

"The facts in the case of *Keeney* v. *Good, supra,* were these: The plaintiff below was the wife of John M. Good, who owned certain lands on which a distillery was built. Becoming insolvent Good made an assignment for the benefit of his creditors. The assignee sold the land to one Rheem for eleven hundred dollars, and by Rheem it was subsequently conveyed to Mrs. Good, the present plaintiff, for the consideration of fifteen hundred dollars. Of this sum fifty dollars were paid at the time the deed was made, and the bonds and mortgage of both the husband and wife were afterward given for the balance. About one thousand dollars of principal and interest seems to have been paid on the lands. Immediately after the deed to Mrs. Good, she and her husband made a written agreement, that the husband should carry on the business of farming and distilling in her name, accounting to her for the profits and receiving from her wages at the rate of twenty dollars per month. While he was doing business under this agreement, he bought a lot of hogs, brought them to the distillery, and fed them there for a time. The defendant levied on them as the husband's property, and the wife brought this action of trespass.

"Black, C. J., speaking for the court, said: 'An insolvent man is well protected in Pennsylvania. The barbarous system of imprisonment for debt is totally abolished, and thrown aside among the rubbish of the dark ages. He can retain real property or goods to the value of three hundred dollars, which his creditors cannot touch. He cannot be prevented from applying the fruits of his personal industry to the maintenance and education of his family; for the wages of his labor are not liable to attachment. But after supporting his family, he must give the best exertions of his mind and body to his creditors. This is but his reasonable duty—a duty sanctioned by

all laws, moral, civil and divine.   No effectual mode of evading it has yet been invented.   The usual device of covering the property of the debtor under the name of some friend, or a member of his family, will only answer the purpose as long as it remains undiscovered.   I need not say how deeply all such shams are branded by the law with the mark of its detestation.'

"In *Pawley* v. *Vogel, supra,* it was held, that the doctrines of equity touching settlements of money or property in trust for the sole and separate use of the wife relate purely to property that belongs to the wife before marriage, or which may have been given or bequeathed to her after marriage and expressly to her sole and separate use by the creation of a trust for that purpose.   In such case a proper instrument based upon a valuable consideration, to the effect that she may carry on a separate trade on her sole account in the name of her trustee, may be protected at law and may be enforced in equity, for the benefit of her husband, against him and his creditors ; but a voluntary agreement of this kind will not be good against his creditors.   And neither law nor equity will permit an insolvent person, in the absence of any instrument like that mentioned, to carry on his own trade with his own money or with moneys, that were donated by himself, in the name and under the cover of being his wife's trustee, for their common advantage.   As between the parties themselves, a voluntary settlement upon the wife may be upheld in equity, and where the husband is not indebted at the time of making it, such settlement cannot be impeached by subsequent creditors merely on the ground of its being voluntary.   But if he were indebted at the time, or if it were made with a view of being indebted at a future time, it will be void against creditors prior and subsequent.

"The facts, upon which the ruling in *Glidden* v. *Taylor, supra,* was based, were chiefly these :   A husband, who had failed in manufacturing business, commenced business anew with the money of his wife, with her consent, and carried on the business, professedly as her agent, for years, making large profits therefrom.   A principal source of the profits was the personal services and skill of the husband.   The wife gave no personal attention to the business.   There was no contract be-

tween her and her husband as to his compensation, and no accounts were kept between the parties. Part of the proceeds of the business was applied to the support of the family, part used by the husband, and part invested in real estate and personal property in the name of the wife. In a suit by the creditors of the husband, to subject the property so purchased to the payment of his debts, it was held : '1.—The wife cannot claim the whole of the property as profits arising from her separate money. 2.—Where she thus suffers her money to be employed by the husband and blended with his earnings so that it cannot be separated, the most favorable position, she can be allowed to assume, is that of a preferred creditor in equity, and, as such, entitled to her money and interest.' The court say :

" 'It is further to be noted that the difficulty of making a division is in no way attributable to the creditors. They are entitled to have the property of the husband appropriated to the payment of his debts, and if the wife authorizes or permits her money to be so mixed with the products of the business and industry of her husband that it cannot be separated, this furnishes no reason why she should gain and the creditors lose thereby.

" 'Without entering into an exposition of the consequences that would follow the adoption of a rule sustaining the present claim of Mrs. Taylor, it is sufficient to say, that we are satisfied, that sound public policy and the settled principles of law and equity alike forbid its adoption ; and that where a wife thus suffers her own money to be employed by her husband and blended with his earnings, so that it cannot be separated, though the business may be conducted in her name, the most favorable attitude she can be allowed to assume in a controversy with his creditors is that of a creditor in equity. At law she can, of course, have no standing as a creditor.

" 'The arrangement between the husband and wife, whereby he undertook to carry on business in her name and for her exclusive benefit, was in effect an attempt to make a voluntary settlement of the products of his skill and industry in favor of his wife ; and the purchase of the property and its conveyance to her was but the carrying out of the arrangement.

"'The principle of the arrangement would be the same, whether it embraced property, which he had already acquired, or only his future acquisitions; and, if the arrangement be valid as against creditors for the period of about four years that elapsed from the time of its date to the time of the trial, it may be continued during the joint lives of the parties, if they so elect; and if the husband should survive the wife, no good reason is perceived why, if he should chose to do so, he might not prolong the arrangement for the benefit of her legal representatives.'

"In *Feller* v. *Alden, supra,* it was held: '1. A wife owning land as her separate estate may cultivate the same by means of the labor of her husband and minor children, and the legal title to the products and proceeds thereof will still be in her, so that they cannot be levied upon under an execution against the husband.    2. Whether a court, in a proper proceeding in equity, will apportion such proceeds and products with reference to the proportionate value of the wife's capital, and the labor and services of the husband and minor children, and subject a due proportion thereof to the payment of the husband's debts, is a question not raised in this action.    3. The mere fact, that the wife employs the husband's services in cultivating her land, is not proof of an attempt to defraud his creditors.    4. Money placed by a wife in her husband's hands to be invested for her does not thereby become his property.'

"The court, in speaking of the rights of the wife, say: 'For if the farm were really the separate estate of the wife, as we have already said, the statute expressly declares, that she may hold and enjoy it with the rents and profits in the same manner and with the like effect, as though she were unmarried. It would seem to follow from this, that she might cultivate the farm, and manage the personal property, by means of any agency which any other owner of such property might employ, and the produce thereof, with the increase of stock, would belong to her.'

"In *Shackleford* v. *Collier, supra,* it was decided, that although a *feme covert* may acquire the possession of property as separate estate, yet if its acquisition was in consideration of money or property of the husband, which was subject to the claims of his antecedent creditors, the wife's claim will gen-

erally be made to yield to those of the creditors; and the real and personal estate in controversy in this case being in part the separate estate of the wife, and the remainder subject to the husband's creditors, it was held that so far as the separate estate of the wife entered into the purchase or production of the real and personal property in controversy, her title thereto was valid and sustained; and as the savings of the *feme covert* out of her separate property are hers, the products and accumulations of her separate estate must be included in estimating her present interest in said property; and that after securing the title and possession of the wife as her separate estate, the residue was subject to the claims of the husband's creditors.

"The case of *Ashhurst* v. *Given, supra*, involved the rights of a testator, trustee, and *cestui que use*. A large estate was devised to Samuel Given, in trust for various persons, and it was provided that the trustee as compensation for his services was to be allowed a reasonable support out of the trust funds for his personal services rendered in conducting and managing the trust estate. The reason given by the testator for not devising any part of his estate to his son Samuel was to prevent the estate devised to his children and heirs from being appropriated to those debts which he contracted in an unfortunate business.

"The estate was so managed by the trustee that it greatly increased in value. The creditors of Samuel, by this suit, sought to reach the estate devised to their children, and if this could not be done, then that the value of his services should be subjected to the payment of his debts. It was held that, as the testator was under neither a legal nor moral obligation to pay his sons debts, he had the right to devise property to his children in such a manner as to prevent the creditors of his son from subjecting the same to the payment of their debts.

"In reference to the services of Samuel as such trustee, the court say: 'Neither can it advance such claim on the part of Samuel's creditors, that the trust-estate may be greatly enhanced by his personal services, and that his services may be worth much more than his support or maintenance. A man, though indebted and wholly unable to pay anything, may dis-

pose of his personal services at what price he pleases, and his
creditors cannot object to his doing so.   If he be content to
give them for his mere support and maintenance, without
more, he has unquestionably the right to do so ; though I
would say, if he has it in his power by means of his personal
services, even when he is destitute of all other means, to sup-
port himself and at the same time to pay his creditors, he
ought to do so.   A proper sense of moral obligation requires
it of him.    But if he does not choose to do so, it cannot be tol-
erated for a moment that his creditors shall be permitted to
seize upon whatever has been committed to his possession
and care, to be managed expressly for the use and benefit of
others, and not for himself.'

"In *Knapp* v. *Smith*, 27 N. Y. 277, the court say : 'Where
the husband is indebted and insolvent, as was the case here,
there is generally more or less reason to suspect that such ar-
rangements are adopted as a cover to disguise the substantial
ownership of the husband and to defraud the creditors.
Whether, in a given case, the transaction is sincere and *bona
fide,* or a colorable device to cheat the creditors of the hus-
band, is a question of fact, to be determined by the jury or
other forum entrusted with the decision of such questions. In
this case, the referee has found the facts necessary to show
title in the plaintiff to the property in question, and he has
omitted to find that her title was infected with fraud.   On
the contrary, by stating that the acts of the husband were
done in the character of the agent of the plaintiff, and that she
was the owner of the cattle which were seized on the execu-
tion, he has virtually negatived the allegation of fraud.   It
is not our duty or right to review the testimony, with a view
to pass upon the correctness of his conclusion, and we, there-
fore, express no opinion upon the evidence in this case.'

"In the case of *Buckley* v. *Wells*, 33 N. Y. 518, the court
say :  'The referee does not find that there was any fraud in
the transaction.   Indeed, it would be difficult to predicate
fraud upon such an arrangement.   The wife of an insolvent
man, having a small separate property, derived from her
mother, is naturally desirous that her husband may be en-
gaged in some business, by which, in connection with her es-
tate, a support may be provided for a large family of children.

The husband has been a merchant. The wife is willing to embark her property in that business with which her husband was familiar, hazardous though it may be; and she empowers and authorizes him to carry on business for her and on her money and credit, holding himself out to the world as her agent. There was nothing fraudulent in that. There is no law in this State which mortgages to the creditor either the person or the labors of his debtor—no longer a law which consigns the innocent and unfortunate to confinement within prison walls. The duty rests upon him to use his best efforts for the payment of his debts; but there is a duty which he owes alike to the public and to his family which is sacred, and that duty is, to provide for the nurture, education and support of his children. He is said to be worse than an infidel, who neglects it. In seeking employment for that purpose, he may apply to the wife if she have a separate estate, as well as to a stranger. If the law allows her to hold property—her own at her marriage, or coming from others besides her husband and free from his control—of necessity she must be permitted to manage it herself, or she may employ others to act for her. As to that separate estate, she and her husband are as distinct before the law as if the marital relation did not exist. As to that property she acts as a *feme sole*, and may deal with her husband as with a stranger, and may, therefore, necessarily employ him and compensate him for its management.'

"In *Gage* v. *Dauchy*, 31 N. Y. 273, the court says: 'While the Legislature leaves the husband the right and makes it his duty to live with the wife, he must necessarily live upon her farm, if they have no other place to live. Surely it could not have been the object of the Legislature to deprive the wife of the benefit of his services. The idea that there should be an agreement between them as to wages is absurd; for the Legislature has not yet changed the common law so as to allow them to make a business contract with each other, certainly, there is no way provided to enforce it. But, even upon grounds of equity, there is no reason why the husband should be entitled to the growing crops which he helps to cultivate on her farm. The law still requires him to support his wife and family. If it was competent for the husband and

wife to make an agreement in respect to his labor, they might agree that he should bring the amount of his wages into the house to be expended in providing them with food and clothing. As he is, by law, bound to provide for his wife and family, the whole support of the family might be cast upon him, while she used the rents, issue and profits of her separate estate to enlarge her wardrobe, or to engage in some new business which the law allows her to carry on, on her sole and separate account, without interference of her husband.

"'If I am not mistaken, this case is controlled by the authority of *Knapp* v. *Smith*, in this court, already referred to. There is no difficulty in holding that, at law, a married woman may own personal property, as against her husband. But her title is always open to inspection, and may be set aside by the court or jury in favor of those who have a right to challenge it for fraud. The creditors cannot reach it upon the ground that it is the husband's, as against his wife, but only upon the ground of fraud.'

"In the case of *Abbey* v. *Deyo*, 44 N. Y. 343 the court say : 'In *Buckley* v. *Wells*, 33 N. Y. 518, it was decided that a married woman could manage her separate property through the agency of her husband, and was entitled to the profits of a mercantile business, conducted by her husband in her name, when the capital was furnished by her, and he had no interest but that of an agent. It was further held that the application of an indefinite portion of the income to the support of her husband did not impair the wife's title to the property. While the law does not prohibit her from doing so, and where the property which is the subject of dispute does not come from him, this circumstance furnishes no evidence of fraud. In arguing this point the appellant's counsel insists that the services, the time and talents of the husband are valuable, and he has no more right to give them to his wife, as against his creditors, than to give to her his property to their prejudice. The one, he says, is as much their property as the other. This argument is entirely unsound. The property of a debtor, by the laws of all commercial countries, belongs to his creditors. He must be just before he is generous. He must pay before he gives. Not so with his talents and his industry. Whether he has much, or little, or nothing, his first duty is the support

of his family.   The instinctive impulse of every just man holds this to be the first purpose of his industry.   The application of the debtor's property is rigidly directed to the payments of his debts.   He cannot transport it to another country, transfer it to his friend, or conceal it from his creditor.   Any or all of these things he may do with his industry.   He is at liberty to transfer his person to a foreign land.   He may bury his talent in the earth, or he may give it to his wife or friend.   No law, ancient or modern, of which I am aware, has ever held to the contrary.   No country, unless both barbarous and heathen, has ever authorized the sale of the person of a debtor for the satisfaction of his debts.'"

In the case of *Cooper et al.* v. *Ham et al.*, after the review of the foregoing authorities by Judge Buskirk, the court announced the principles, that "A wife may employ her husband to act as her agent in operating a mill owned by her, and such employment is not proof of an attempt on her part to defraud his creditors; and the husband in such case has the right to give his personal services and skill to the management of his wife's property without any other compensation than the support and maintenance of himself and family."

Judge Buskirk in that opinion said : "It is firmly settled by the foregoing authorities, that the first and highest obligation of a husband is to provide for the support, maintenance, and education of his family, and that after this is accomplished, he should give the best exertions of his mind and body to accumulate means for the payment of his debts.   But while this moral obligation rests upon a married man, there are no means known to the law, by which it can be enforced.   George Ham has the right to give his personal services and skill to the management of his wife's property, without any other compensation than the support and maintenance of himself and family.   In the present case, there has been no accumulations of other property resulting from the profits of the mill, nor has the mill been paid for; but there are debts against it, and liens resting upon it.   If these debts are paid, and the liens discharged, the question, which is considered in several of the foregoing cases, may arise, and that is, whether the husband can by his labor and skill add to and increase the separate property of his wife, without giving his creditors the

right to have the proceeds and profits apportioned between themselves and the wife. Or, if the earnings of the husband should be invested in other property, in the name of his wife, or if there should be money coming to him for his services and skill, which could be reached by a proceeding in attachment or supplementary to execution, the question discussed in many of the above cases would arise; but these questions are not now before us, and we decide nothing in reference thereto."

Yet Judge Buskirk held, that Mrs. Ham, being the owner, "had the right to appoint her husband her agent to carry on the business for her, provided such employment was in good faith and not merely colorable." In that case Martin G. Ham, who was part owner, and George W. Ham, the husband, superintended and directed the erection of said mill, and aided by their own labor and the use of a wagon and team, which belonged to them, in its construction. After the mill was completed, the husband and Martin G. ran and operated it, until Martin G. sold and conveyed his part to Melvin Seward, but the husband continuously worked and superintended said mill from the time of its completion down to the commencement of the action. The judgment was upon notes in favor of appellants, signed by the husband and wife, prior to the erection of the mill.

In the case of *Patten* v. *Patten* 75 Ill. 446, Mr. Justice McAllister, in a forcible opinion deduces the following principles: "The effect of the married woman's act is such, that the rights of the husband at common law in respect to the wife's property are swept away and gone. As to her separate estate and her relations thereto she has no husband, and he is to such estate even during coverture a stranger. As the wife may make her husband her agent to collect debts due her, to receive from others the income of her estate, and to manage and control it in her name, his dealings with it will be presumed in the absence of proof to the contrary to be in the character of agent. His receipt of proceeds and income with her consent will be in that character, and for her, and they will not become his property. If the husband claims such income as a gift, or other legal transfer thereof by the wife to him, the burden of proof is upon him to establish his claim.

Where the husband manages his wife's estate, and receives moneys, etc., belonging to her, he will hold it in trust for her, and he will be compelled to account to her for it ; but in such case like other agents in the absence of special contract he will be entitled to reasonable compensation for his services within the agency on behalf of such separate estate."

The learned judge referred to the case of *Cookson* v. *Toole*, 59 Ill. 515, to point out some of the distinctions, and implications arising therefrom, between the separate estate of the wife as the creature of equity and that existing by operation of the statute of 1861, and shows, that although the estate of a married woman under a settlement for her separate use was recognized and maintained in equity with the incidents of the ownership, yet the common law marital rights of the husband co-existed, and consequently she could seek no remedy for deprivation of equitable rights except in a court of equity ; but where she has a separate estate within the purview of the statute, she holds an absolute legal estate, if that would be the character of it in a *feme sole*.

"No question as to subordination to the common law rights of the husband can arise ; for backward as may be courts, or the profession to recognize the situation, those rights are by the statute swept away and gone. She is entitled to own, hold, possess and enjoy such estate precisely as if she were sole and unmarried. As to such estate and her relations thereto she has no husband ; he is as a stranger even during the coverture. Now it seems to us, that when the question arises, whether by the fact of their living together as husband and wife and their dealing, he receiving the income of her estate, she has not so consented as to preclude her from ever recalling it, the distinction we have attempted to point out becomes essential, the *status* of the parties in the two cases being so materially different."

*Rankin* v. *West*, 25 Mich. 195, under a statute similar to ours, the court laid down the doctrine, that "A married woman may carry on business in her own name, and her husband may act as her agent in carrying on such business. A business thus carried on by the wife for the purpose of keeping property purchased by her from the reach of her husband's creditors would not be a fraud upon the creditors of the husband, un-

less the necessary result was to hinder, delay, or defraud such creditors in the collection of their debts; and if the property in question would never have come to the possession of either the husband or wife, except in pursuance of an understanding, that she should be the purchaser, and carry on the business by means of it, such a purchase cannot wrong the husband's creditors."

In *Keller* v. *Mayer, Straus & Baum*, 55 Ga. 406, where creditors of the husband levied upon goods in a store carried on by him as agent for his wife, and the wife claimed the property under a statute similar to our own, on the ground that the business was commenced upon money borrowed by her from her uncle, and had increased therefrom. The husband gave his entire time and attention to the business as her agent, receiving for his services nothing but support and necessary expenses; and there does not appear to have been any express contract on the subject of his compensation. Judge Bleckley, after reviewing the charge to the jury and pronouncing it erroneous states the law to be, that " if the husband in buying and selling use the wife's money for her in her business, the goods are the wife's, not the husband's, and are not subject to his debts. If he be truly her agent, he is not his own principal; and the fruits of his agency belong to her. If on the contrary the truth of the case be, that the husband is merely using the wife's money with her consent in his own business, she is his creditor for the principal advanced with interest; and the stock and all accumulations are his and the rights of his creditors attach."

Again the Judge says: "Husband and wife are not permitted to cover with her name his business or property, in order to protect it against his creditors. Any fraud or false coloring may be exposed, and the very truth of the matter established. If the property under seizure be that of the husband, the creditors will prevail; but if it be that of the wife, who is not their debtor, nor bound to pay her husband's debts, they ought not to prevail."

Again, he says: "In Georgia, as the law now stands, the wife is a *feme sole* in respect to her separate property, and the husband may become her agent or employe in its management. She needs no trustee to hold title or make contracts.

The legal as well as the equitable title (when the estate does not come to her united with a trust,) is in her, and she can bind it with her contracts. Even her husband, acting fairly and *bona fide,* may become her creditor for services by contract expressed or implied, and if he be such creditor, his creditors have their remedy against her by garnishment. The law will keep a close watch over the married pair to prevent fraud, but will not interdict fair dealing between them except in the instances expressiy prohibited."

The wife's claim was sustained against the husband's creditors.

The third section of chapter 66, Code of West Virginia (1868) provides, that : " Any married woman may take by inheritance, or by gift, grant, devise or bequest, from any person *other than her husband,* and hold to her sole and separate use, and convey' and devise, real and personal property and any *interest or estate therein,* and the rents issues and profits thereof, in the same manner and with like effect as if she were unmarried, and the same shall not be subject to the disposal of her husband, nor be liable for his debts. Provided, that no married woman, unless she is living separate and apart from her husband, shall sell and convey her real estate, unless her husband joins in the deed or other writing by which the same is sold or conveyed."

The thirteenth section provides, that, " A married woman living separate and apart from her husband may, in her own name, carry on any trade or business; and the stock and property used in such trade, and the issues and profits thereof, together with her own earnings, realized from such trade or business, or otherwise, shall be her sole and separate property, and shall not be subject to the control of her husband, nor liable for his debts."

It has been urged, that a married woman cannot carry on business in her own name touching her separate property, unless living separate and apart from her husband ; but I do not believe such to be the true construction of the statute, or to have been the intent of the Legislature.

In applying the law hereinbefore quoted to the facts of the case before us, I feel confident that under the said third section of our statute a married woman may engage in business

for the purpose of preserving and increasing her separate property, although living with her husband, and by trade, barter, or sale, change the character of her personal property without impairing her title to the after acquired property. And if there is not established a want of *bona fides*, the business may be done through her husband as her agent; and all accretions, accumulations, or appreciation in the value of such property, resulting from handling or exchanging the same, enures to the benefit of the wife, without regard to the question of coverture.    He was her agent, and *"qui facit per alium facit per se."* The law of agency is not changed by reason of the marital relation, and it follows that the agent can not in the execution of his duties as such, obtain any tangible interests in the property in his charge.

In this case the evidence conclusively shows that the property levied upon under an execution sued out by the husband's creditor against him, the title to which was by Hannah Miller made the subject of an investigation under our statute of interpleader, chapter 107, Code of 1868, is, so far as this record shows, property which was purchased for and in the name of the wife by her husband as her agent, and with the money given her by her father, the husband having bestowed only his time, attention and labor in converting the timber, so purchased with her said money, into oil barrel heads, and also having given the services of his horse in the hauling thereof.    There was no contract between him and his wife for compensation for such services.    The question arises, whether the character and title of the property has been so changed by the labor and management of the husband, and the services of his horse in and about the hauling, as to deprive the wife of her title thereto and vest it in the husband so as to be liable for his debts?    The very proposition is ludicrous.    It is clear, I think, that Hannah Miller never parted with any portion of her rights or title to the property by employing her husband in the management thereof; and under the weight of authority before cited the creditors could not deprive her of the property.    But, it may be, if she were indebted to her husband for his labor and agency and for the labor of his horse, the true course and proper remedy of Peck, the execution creditor, would have

been, to have suggested her as having property of or owing money to the husband, as provided by our statute of garnishment.

In granting to a married woman, as the third section does, the right to acquire, hold and dispose of separate personal property and the issues and profits thereof, *"in the same manner and with like effect as if she were unmarri*ed," and declaring that *"the same shall not be subject to the disposal of her husband, nor be liable for his debts,"* we are to presume that the Legislature did not intend a vain thing, but meant what it said, and that was, so far as her separate personal property was concerned, to absolutely emancipate it from the claims of her husband and his creditors, and that her title thereto, her rights therein, and her remedies for the protection thereof, should be as full, complete and perfect as that of a *feme sole,* or man could be to his or her own property. She is restricted as to conveying real estate, but free as to the management and disposal of her personal estate. What remedies and privileges does the law afford her to protect her rights ? By section twelve of the same act, "a married woman may sue and be sued without joining her husband in the following cases. 1. Where the action concerns her separate property," &c., &c. Upon the hypothesis that Hannah Miller owned separate property which was levied upon as the property of her husband, can she avail herself of all the rights of a *feme sole* or man-suitor in defending her title and rights of property? Can she interplead as provided by the 107th chapter of the Code 1868? The second section of that chapter provides, that "when property of any value is taken under an execution issued by the clerk of a court, *and any person,* other than the party against whom the process issued, claims such property, or the proceeds or value thereof, the circuit court of the county in which the property is taken, or the judge thereof in vacation, upon the application of the officer, where no indemnifying bond has been given, or if one has been given, on the application of *the person* who claims such property and has given such suspending bond, as is hereinafter mentioned, may cause to appear before such court, as well the party issuing such process, as the party making such claim ; and such court may exercise, for the decision of their rights, all or any

of the powers and authority prescribed in the preceding section."

The preceding section of said chapter, provides that the court "shall give judgment upon the verdict rendered, or, if a jury be waived by the parties interested, shall determine their claims in a summary way."

Now here the statute describes an inexpensive and summary way to determine the claim of "any person," other than the party against whom the process issued, to the property levied upon. It cannot be doubted that a *feme sole*, or a man, could avail himself or herself of the remedy ; why then cannot a married woman do the same as to her separate property, when the law declares that she shall have all the rights as to such property as if she were unmarried? and when the said second section grants the summary remedy to "any person?" To ask either question, is to answer it. She should not be forced into an expensive and tedious chancery suit when the law gives so simple and efficient a remedy. It would be absurd to declare that, while any person, other than a married woman, might summarily defend his or her title to property wrongfully taken, and in the mean time, by giving a bond, enjoy the use and possession of the property until the claim thereto is determined, she is compelled to resort to remedies which would afford her no right to the possession or use of her own during the dilatory and expensive proceedings incident to a chancery suit. The right of a married woman to exercise this summary remedy is clearly foreshadowed in the case of *Stockton* v. *Farley*, 10 W. Va. 171, where Judge Green, delivering the opinion, said :

"It may be possible that a married woman living separate and apart from her husband, might be sued on her contract in this State in a common law court as an incident to the authority conferred on her by the thirteenth section of chapter sixty-six of the Code of West Virginia, page four hundred and forty-nine, to carry on in her own name any trade or business for her sole and separate use. But it is unnecessary in this case to express an opinion on this point. I think it is certain, that, in no case, could she be sued in this State in a common law court, upon a contract, though she may bring an action to recover her private property, she being now the legal

owner thereof; and perhaps in some other cases, to enforce her rights in relation to her private property, even when based on contract."

I am therefore of opinion that Hannah Miller had the right to set up her claim to the property in the manner she did, by the summary proceeding given by the statute. I am also of opinion that the fact of the husband having given his services and that of his horse exclusively in behalf of the business affairs of his wife, without a contract expressed or implied, for compensation therefor, does not establish in him any interest in or title to the barrel-heads in question, and does not therefor give a right to his creditors to levy on the same for a debt against him, although it might under other state of facts be material evidence tending to show a want of *bona fides*, which is not manifest in this case. Therefore the questions, as to whether the husband was entitled to compensation for his services and the services of his horse, and whether his creditors could follow it into the hands of the wife, do not arise in this proceeding, it being merely and only to try the claims of title to the barrel-heads, and not to determine the right of the husband to compensation, or to furnish remedies to the creditors of the husband for collecting from the wife the value of such services. I therefore express no opinion on that point.

For the foregoing reasons I am of opinion, that the judgment of the circuit court is erroneous in so far as it decided that said Hannah Miller was not entitled to the "oil barrel heading," and that the said judgment should, therefore, be reversed at the costs of said Andrew Peck, and this court proceeding to render such judgment as the circuit court should have rendered, doth consider that said bay horse, and the said white oak oil barrel heading wood described in the petition, are the separate property of the petitioner, Hannah Miller, and are not liable for the debts of her husband; and the court doth order that the said property be released from the levy in the petition set up, and that the said Hannah Miller have and hold the said property as her separate property free from the payment of the debt of said D. B. Miller, levied thereon, as set forth in the petition; and it is ordered that the petitioner,

Hannah Miller, recover against the defendant, Andrew Peck, her costs about her petition in this behalf expended.

JUDGE JOHNSON CONCURS WITH MOORE P., JUDGE HAY-MOND CONCURS IN THE CONCLUSION OF THE OPINION, AND THE SAID JUDGES CONCUR IN THE SYLLABUS. JUDGE GREEN DISSENTS.

JUDGMENT REVERSED.