# WHEELING.

CAMDEN & CO. *v.* SARAH AND JACOB HITESHEW.

Submitted June 26, 1883—Decided December 15, 1883.

1. The debts of a married woman, for which her separate estate is liable, are such as arise out of any transaction, out of which a debt would have arisen if she had been a *feme sole*, except such as are not founded on a consideration. (p. 239.)

2. A married woman having separate property may carry on business through her husband as her agent. (p. 239.)

3. Where a husband is carrying on business in the name of the wife as her agent and executes a note as agent of his wife for a balance found against her in such business, the separate property of the wife is liable for the payment of such note. (p. 237.)

4. A case in which on conflicting evidence held, reversing the court below, that the wife carried on business through her husband as her agent. (p. 247.)

The facts of the case are stated in the opinion.

*Van Winkle & Ambler* for appellants:

1. A married woman may trade and contract debts through her husband as her agent. *Miller* v. *Peck*, 18 Gratt. 75.

2. Her property is bound for her *indebtedness,* whether a note given for it, and accepted as hers, is binding upon her or not. *Radford* v. *Carwile*, 13 W. Va. 562; *Hughes & Co.* v. *Hamitton*, 19 W. Va. 366.

3. The note in suit was in the usual form of notes given by Mrs. Hiteshew. *Devandorf* v. *Oil Co.*, 17 W. Va. 174.

4. The plaintiff relied upon her property to pay for goods, which she knew were being bought in her name and upon her credit. The plaintiffs believed they were dealing with her, in good faith. She received their goods knowing all these facts. Even a married woman is estopped by such conduct. Pollock on Contracts, 584, 68-9 and notes.

5. If in point of fact it was her indebtedness, the form of the note is wholly immaterial, (*Hager* v. *Rice*, 34 Amer. R. 156; 1 Minor Inst. 211; 2 Smith L. C. 377; Ewell on Agency, 579, 586, 590; Story's Agency, § 261,) and plaintiffs are entitled to have satisfaction, by subjecting her personalty and the rents and profits of her realty. 13 W. Va. 562.

*Leonard & Caldwell* for appellees.

JOHNSON, JUDGE :

J. N. Camden & Co. filed their bill in November, 1881, against Jacob Hiteshew and Sarah, his wife, alleging that in the year 1879 the defendant, Sarah Hiteshew, traded and dealt with the plaintiffs and bought goods of them, and paid in part for said goods by delivering to them stave and barrel

timber; that during the whole of the period, when she so traded with them, she was and is now. a married woman residing with her husband, the said Jacob Hiteshew; that the goods were bought by her in her own name and on her own credit, and upon her own separate responsibility, all of which was done with the knowledge, consent and acquiescence of her said husband; that she gave a note to close her account for the sum of three hundred and twenty-five dollars and fifty-eight cents; that said note is signed "Jacob $\overset{\text{his}}{\underset{\text{mark}}{\times}}$ Hiteshew for Sarah Hiteshew;" that Jacob Hiteshew transacted business as the agent of his said wife, for her and in her name; that the said Sarah also often purchased goods and property in person from the complainants; that the credit for goods so purchased was so given upon the representation made to plaintiffs that the said Jacob Hiteshew was acting as agent for his wife, and that he was duly authorized by her to act as such agent; that the note so given is a renewal of a former note of said Sarah Hiteshew; that she knew that renewals had been made of said note, and that her property was liable for the payment thereof; that she knew the note was taken upon the faith and credit of her property. The prayer is that her property may be subjected to the payment of said debt and for general relief.

It is alleged in the bill, that she is the owner of two tracts of land, which came from her husband, through a conveyance by him to L. N. Tavenner and by Tavenner to her, one tract described as one hundred and ninety-six acres, and the other fifty acres. The bill does not set out any personal property owned by said Sarah Hiteshew.

A demurrer to the bill was properly overruled.

The defendants separately answered the bill. Jacob in his answer denied that he ever did business as the agent of his wife, averring that he was ignorant and could not read writing; that he never signed his name as agent for his wife to any contract or notes and did not sign his name as agent for his wife to. the note set up in the bill; and averred that he did not know it was so signed.

Sarah Hiteshew in her answer expressly denies, that she carried on business through Jacob Hiteshew as her agent. She also denies that she furnished Camden & Co. any staves

or anything else, or bought in her own name any goods from them; denies that her husband was authorized to do anything as her agent; denies that he was authorized to sign the note set up in the bill as her agent, or that he ever did business as her agent.

On the 18th day of December, 1882, the court entered the following decree: "This cause came on this day to be heard upon the bill and exhibits filed therewith, the answers of defendants and exhibits filed with answer of Jacob Hiteshew, and replication to said answers, and proofs filed, and was argued by counsel. On consideration whereof the court is of opinion, that the plaintiffs are not entitled to the relief prayed for. It is therefore adjudged, ordered and decreed, that the plaintiffs' bill be dismissed, and that the defendants recover against the plaintiffs their costs in this suit expended."

From this decree plaintiffs appealed.

Is the decree right? This depends upon a question of fact. If the note sued on is the note of Sarah Hiteshew, her separate estate is liable for the payment thereof out of the rents and profits of her real estate, it not appearing in the record that she has any personal property. The debts of a married woman, for which her separate estate is liable, are such as arise out of any transaction, out of which a debt would have arisen, if she had been a *feme sole*, except that her separate estate is not bound by a bond or covenant based on no consideration, such bond or covenant being void at law, and she is not estopped in a court of equity from showing that it was based on no consideration. *Radford* v. *Carwile*, 13 W. Va. 572.

This Court were unanimous in the case of *Miller* v. *Peck*, 18 W. Va. 75, in holding, that a married woman having personal property, which she is allowed to hold by statute as her separate property, may barter and trade with reference thereto through her husband as her agent, and that she will be entitled to the increase thereof, though living with her husband. Judge Green differed with the majority of the Court on other points decided in that case, but not on this. If therefore, as charged in the bill, Sarah Hitshew was carrying on business through her husband as her agent, and

executed the said note in suit here by her husband as such agent, her separate property is liable for the payment thereof.

The answer of Jacob Hiteshew exhibits several accounts rendered to him during the time of the dealings with Camden & Co., which were made out against him individually. The depositions of Jacob Hiteshew and Sarah Hiteshew are taken, in which they severally testify, that Jacob did no business for her as her agent, and that she had no dealings with Camden & Co.

W. N. Chancellor, a member of the firm of Camden & Co., in his deposition says: "The note filed in this suit of three hundred and twenty-five dollars and fifty-eight cents, dated March 15, 1881, at sixty days, payable to the order of Camden & Co. and signed by Jacob Hiteshew, agent for Sarah Hiteshew, is due to the plaintiffs with interest from May 17, 1881. I have examined exhibit "A" filed with Jacob Hiteshew's answer and dated November 1, 1872. It is in the handwriting of J. N. Camden and was between my firm and Jacob Hiteshew, and all matters in that contract have been settled up. The note now sued on has no connection whatever with said contract of 1872. I have examined exhibit "B" filed with Jacob Hiteshew's answer, which is in my handwriting and was drawn up by me in the presence of Jacob Hiteshew on December 27, 1877. It is an exact copy or duplicate of a paper retained by me and executed at the same time, with the exception that the paper we retained bears date as stated December 27, 1877, and the paper handed to him has the name of "Camden & Co." written across its face by me, as now appears on said exhibit "B." The paper retained is in the possession of my firm and ready to be produced, if desired. The contract was made with Jacob Hiteshew, agent for Sarah Hiteshew. The way that this contract was made was as follows: Mr. Jacob Hiteshew came to us to make a contract for staves. We agreed upon the number of staves, the price, and how they should be paid for; he said that he expected to get these staves out at or near where he lived on Stilwell, a portion of which he had already out, and that he expected to keep some goods there for sale to facilitate this business of getting out staves.

Then the question arose how he would make this contract. I had knowledge of his financial standing, which was that he was not doing business in his own name, he having no financial standing at all; and he said that he was going to run the business as agent for his wife. He did not give any reason at all, as I knew his financial standing. We agreed on terms, and the contract was reduced to writing by me in his presence at that time. I considered that Hiteshew wanted this contract as much for his protection as for ours in order to protect his wife's property from any levy for his debts. * * * The contract was read to him; and he said it was all right. He signed it as agent for Sarah Hiteshew, making his mark, and requested a duplicate of it, which was given, and is exhibit "B," with the addition of "Camden & Co." being written across the face. I read the contract to him as the contract of Jacob Hiteshew agent for Sarah Hiteshew. * * * This note sued on is the balance due on transactions had under this contract; this contract is the foundation of the indebtedness, which the note represents. Some fifteen notes were given based upon this contract, from time to time as settlements were had and balances given, or renewals made. * * * Never heard any question from Jacob Hiteshew or his wife as to Sarah Hiteshew's liability on the note under that contract, until after this suit was brought. * * * * Some time prior to the maturity of this note Mr. Hiteshew called for the old notes that had been settled by renewals and otherwise, and they were given to him."

Witness said the ledger was opened "Jacob Hiteshew, agent." Being shown the accounts filed with Jacob Hiteshew's answer, and asked to state on what account the goods therein mentioned were sold, and on whose credit, said: "They went to the account of Jacob Hiteshew, agent, on our ledger and on the credit of Jacob Hiteshew, agent for Sarah Hiteshew, under the contract of December, 1877, with the exception of the account of J. P. Wait, which I know nothing about." Witness further said: "It was understood that all goods purchased under this contract should be charged to Jacob Hiteshew as agent under that contract, as there was no other account opened, or would be opened,

31

during the pendency of that contract with Jacob Hiteshew, or his wife."

In answer to the question, "state what those items of account and bills are?" he said: "They are memorandums given to Mr. Hiteshew, made by the clerks selling the goods, showing the amount of the goods and the cost of same, so that they could be marked to sell again, but not made out, as a general statement would have been made by the general book-keeper, who kept the accounts." Witness further said: "When the contract of 1872 was made Jacob Hiteshew was considered solvent, hence the contract was made with him; when making the contract of 1877, Mr. Hiteshew represented, and it was known to me by general rumor, that he could not do business in his own name, having been unfortunate in business and having transferred his property to his wife."

On cross-examination, in answer to the question, "did you ever talk to her, (Mrs. Hiteshew) about the contract at any time?" witness said, "not to my recollection."

*Thomas Hawks* the bookkeeper of plaintiff's testified: "I filled out the note sued on and others of the fourteen, 'Jacob Hiteshew agent of Sarah Hiteshew' in that manner, because I know that this was the arrangement, between Hiteshew and the firm, the first note having been drawn in this form, and the contract signed in this manner, in making the note sued on. I am sure that the signature was read to him as written. I have heard read the statement in Jacob Hiteshew's answer, in regard to the making of the note sued on, and do not see how it is possible he should have signed this and other notes in the same form, when they were carefully explained to him; his statement in regard to these notes not being explained to him is very incorrect. I went out to Mrs. Hiteshew's home one time some distance from Parkersburg, and saw Mrs. Hiteshew in reference to one of the notes. I told her that this note in question had been lying over in bank for some weeks, and that we were anxious to get it in shape again by renewing it. She answered that Mr. Hiteshew was in town that day. I then asked her as Mr. Hiteshew was in the habit of signing these notes for her, if she would sign this one as I might miss seeing Mr. Hiteshew

when I returned to town. She answered that she had rather not; as Mr. Hiteshew had commenced the transaction, she had rather that he would sign the note himself, and would inform him of my visit out there, and have him call at the office as soon as he could and arrange it. She said that he was conducting her business, and that he knew more about this transaction than she did." He further said "I told her that her husband was in the habit of giving us notes in her name as agent, and for fear of not meeting Hiteshew in town, would she sign the note herself, that I could use it in bank that day, and she answered as above."

On cross-examination, he said the time when he went to Mrs. Hiteshew's, "was before the note sued on was given." It was evidently one of the notes of which the note in suit was a renewal.

*A. B. Chancellor* testified: "I went with said Hawks at his request for companionship and in order to show him the way. The statement of Mr. Hawks is entirely correct to the best of my belief as to the conversation there occurring with Mrs. Hiteshew. I cannot state the words used but I do remember distinctly that Hawks said to her, Sarah Hiteshew, that he had come out for the purpose of getting arranged indebtedness lying in the First National bank, by way of a note or notes executed in her name which note had been overdue some little time. He asked her to sign the note herself, but she said that she had rather not as he was in the habit of attending to that business himself. She said he was in town that day and I think she said he was in town for the purpose of attending to that business."

*O. G. Schofield* testified, that he was deputy collector of internal revenue for the First district. He said: "In the license year ending April 30, 1878 and 1879, I granted license to Sarah Hiteshew from November 1, 1877, as a dealer in manufactured tobacco, having her postoffice at Murphy's Mills, and in the following year from May 1, 1878, to April 30, 1879, she paid the special tax for that year and took a special tax-receipt, in her own name both times. This special tax-receipt is sometimes spoken of as a government license. It covered dealers in manufactured tobacco. I cannot say as to the year 1878, whether she was there or not in person,

but for the time from November, 1877, to April 30, 1878, being a fractional part of a license year, she was required to make oath to the application in person; whether she appeared before me or sent an affidavit duly certified I cannot now say. The tax receipts were delivered to her or the person who represented her, and were in her name."

*P. C. Barrett* testified: " I know where Mrs. Sarah Hiteshew had a store in Wood county in the past three or four years, at a place on the Northwestern turnpike, about thirteen miles from Parkersburg, and about four miles from Murphy's Mills, at a place called Dog Town. Her postoffice is Murphy's Mills, Wood county, and was during that time. I had been and am postmaster at Murphy's Mills myself. I have been at the store, that is I have passed it, but do not think I was ever in the store during the time she was carrying on business there. I saw Jacob Hiteshew there; in the community out there the general undersanding and report was that the business was being done in her name at that store. Neither Jacob Hiteshew or his wife ever said anything to me about it, but the general talk and representation was as I have stated above."

*A. G. Leonard testified* that Hiteshew bought goods of the firm of J. P. Vaughn & Co. When he did not pay for them he gave his note as agent. It was understood that he was agent for his wife. The notes that were not paid have been acknowledged by Mrs. Hiteshew as her paper. They were signed by Jacob Hiteshew as agent. "Jacob Hiteshew told me he was agent for his wife. In a suit brought by J. P. Vaughn & Co. in chancery in the circuit court of this county on a note for fifty-seven dollars and six cents against Jacob Hiteshew and wife, which note I now hold in my hand and is signed ' Jacob $\overset{\text{his}}{\underset{\text{mark}}{\times}}$ Hiteshew, agent.' In that suit the original note is filed, which closed the account. I cannot file the note with my deposition, because it is filed in that suit; the indebtedness covered by this note was given on the credit of Mrs. Hiteshew, not regarding Mr. Hiteshew entitled to financial credit except so far as he could bind his wife by his signature as agent. My firm dealt in tin and hardware. I understood from Mr. Hiteshew that he had a little store up there and that these goods were for that store. He did not

tell me in whose name the store was; he told me who he bought the goods for; he told me that he was doing business in the name of his wife, who was good and responsible for all these things.    He said the store was somewhere on Stilwell where he was getting out timber for Camden & Co.    I do not know, that she spoke to me about it; but she wrote to us, to stay it or put it off, which letter I handed to our counsel.    She was present at one time I know.    It was when he was renewing one of the notes, asking to have it renewed she saying that they could pay it, if they were given more time, she giving assurance to that effect.    *    *    *    He gave the note as agent at that time."

On cross-examination in answer to the question:    "Are you positive that in a conversation that you had with him on the 3d day of May, 1881, that he stated that he was doing business for his wife and acting as agent for her?" he said: "Yes, sir; I know that he stated that he signed this note as agent for his wife or I would not have taken it."

*Jas. W. Dils* in his deposition in answer to the question "state whether you ever had a conversation with Jacob Hiteshew about a purchase of goods in Pittsburg to be sold at the store on Stilwell creek in Wood county, and if so what was said on that occasion?" said, "Yes, sir, I did have a conversation with Jacob Hiteshew about buying said bill of goods.    Jacob Hiteshew told me that his wife, Sarah Hiteshew, had been to Pittsburg and bought a small stock of goods in her own name, and was going to take them to Stilwell, and that the business would be done by her, that is in her own name."

In opposition to this evidence there is nothing but the unsupported depositions of Jacob and Sarah Hiteshew, in which they deny everything contained in the depositions which refer to the matter of Hiteshew's agency for his wife. Sarah Hiteshew denies that she had been engaged in any business, denies that Jacob Hiteshew was her agent, or doing business as such, denies that she had any store in Stilwell. She admits that she went to Pittsburg and bought goods to put in the store but says Mr. Hiteshew gave her the money to do it; that the store was not hers.    She does not pretend to explain why she paid to Schofield the special tobacco-tax;

does not say a word about it; does not even refer to Mr.
Leonard's testimony, which shows she admitted that Jacob
Hiteshew was her agent. She does deny the conversation
which Mr. Hawks said he had with her in A. B. Chancel-
lor's presence. With regard to that she says: "A young
man came partly up the steps and asked if Mr. Hiteshew was
at home. I told him 'no.' He said he came out to get him
to sign a note to Camden & Co. and asked me if I would tell
him to come down. I told him I would tell him; and he
turned and walked away, and that was all he said in regard
to it." Hiteshew and wife are both contradicted in many
ways in all the material points, upon which they rely, as I
have shown by a review of the testimony. If the two Chan-
cellors, Hawks, Leonard, Dils, Barrett and Schofield are cor-
rect in their statements, then neither Hiteshew nor his wife
can be correct in theirs. If plaintiffs' witnesses depose to the
*facts*, then it is clear that Hiteshew was the agent of his
wife, and that she did business through him. The plain-
tiffs' witnesses are corroborated by the circumstances sur-
rounding the case, which often furnish more potent evi-
dence than the adverse declarations of many witnesses.

It is a fact admitted in the case, that in 1876, Hiteshew
conveyed his real property to L. N. Tavenner, and Taven-
ner at once conveyed it to Mrs. Hiteshew. This furnishes
a powerful reason for Mrs. Hiteshew coming to the front
and transacting business through her husband as agent.
She having the property could obtain the credit necessary
to carry on the business; he having no property could not
expect credit. From the attitude the defendants now assume
towards the plaintiffs holding this just claim against Mrs.
Hiteshew.it would seem, that the arrangement was a double
one, viz: If Hiteshew was sued for his debts, he could show
by evidence, that he owned nothing, everything being in his
wife's name, and all the buisness transacted·by him was in
her name by him as agent; if she were sued, as in this case,
deny the agency, deny everything, and rely upon a failure of
evidence to escape. Such a course of double dealing can-
not receive the approbation of a court of equity. Fortu-
nately there is abundance of evidence as we have shown in
this cause to prove the allegations and charges of the bill.

The decree of the circuit court is reversed with costs, and the cause remanded, with instructions to enter a decree renting the real property in the bill mentioned, until the debts and costs are paid, if the marriage continue so long.

REVERSED.   REMANDED.

# WHEELING.

